```
UNITED STATES DISTRICT COURT
  MIDDLE DISTRICT OF ALABAMA
       NORTHERN DIVISION


GEORGIA SOUTHWESTERN RAILROAD,  )
INC., a Corporation,            )
                                )
        Plaintiff,              )
                                ) CIVIL ACTION FILE
vs.                             )
                                ) NO. 2:06CV3-B
AMERICUS C. MITCHELL, JR.,      )
                                )
        Defendant.              )
```

Deposition of TERRY R. SMALL, taken by counsel for Defendant, pursuant to agreement, under the Federal Rules of Civil Procedure, and reported by Grace F. Lengmueller, RPR, held in the offices of Georgia Southwestern Railroad, Inc., 78 Pulpwood Road, Dawson, Georgia, on August 25th, 2006, commencing at 9:16 a.m.

ACCREDITED COURT REPORTERS
Post Office Box 1701
Columbus, Georgia 31902
(706) 323-3640
(800) 662-2741

---

APPEARANCES OF COUNSEL:

FOR THE PLAINTIFF:

  ADRIAN D. JOHNSON
  Attorney at Law
  Parnell & Crum, P.A.
  641 South Lawrence Street
  Post Office Box 2189
  Montgomery, Alabama 36102
  (334) 832-4200

FOR THE DEFENDANT:

  D. CRAIG ALLRED
  Attorney at Law
  David E. Allred, P.C.
  7030 Fain Park Drive
  Suite 9
  Post Office Box 241594
  Montgomery, Alabama 36124
  (334) 396-9200

  ALSO PRESENT: Terry B. Eggers
                Jason S. Revalee

                - - -

                I N D E X
                                                   PAGE
OPENING REMARKS AND STIPULATIONS -------------------  3

EXAMINATION:
    By Mr. Allred ---------------------------------  3
    By Mr. Johnson -------------------------------- 49

CERTIFICATE --------------------------------------- 59

EXHIBITS:
    Defendant's Exhibit Number 1 ------------ 34
    Plaintiff's Exhibit Number 1 ------------ 49
    Plaintiff's Exhibit Number 2 ------------ 49
    Plaintiff's Exhibit Number 3 ------------ 52
    Plaintiff's Exhibit Number 4 ------------ 52

---

    MR. ALLRED: We're going to have the usual stipulations with -- he and I have agreed that this will be admissible in an Alabama court since you're a Georgia court reporter, and we've already agreed to that prior to the deposition.

            TERRY R. SMALL,
having been produced and first duly sworn as a witness, testified as follows:
                 EXAMINATION
BY MR. ALLRED:
    Q   Mr. Small, I'm Craig Allred here for Americus Mitchell, the defendant in this case. I'm just going to ask you a few questions here. If at any time you -- if I'm not clear on the question or you don't understand the question, just let me know; I'll be glad to repeat it for you. Or if you'd like to talk to Adrian at any time, just let me know, and we can pause for a minute, and y'all can go out in the hall.
        Would you please state your name for us one more time.
    A   Terry Ray Small.
    Q   Okay. And you're an employee of the Georgia Southwest Railroad?

---

    A   Yes.
    Q   Do you own the company?
    A   Majority, yes.
    Q   Okay. What's the general corporate structure of the company?
    A   It's privately held; myself and one other shareholder.
    Q   Okay. And who's that other shareholder?
    A   David L. Smoot.
    Q   Okay. And if you would, tell me a little bit about what type of railroad this is.
    A   This is a short-line railroad that basically -- we operate from Greenville, Georgia, to Bainbridge, Georgia; Smithville to White Oak, Alabama, into Eufaula.
    Q   Okay. So just in the states of Georgia and Alabama?
    A   Yes.
    Q   Okay. And it's a Georgia corporation; is that --
    A   No. Delaware --
    Q   A Delaware --
    A   -- corporation.
    Q   -- corporation?
    A   Yes. Yes.

```
 1      Q    Okay.  What -- what types of freight do you
 2   haul?
 3      A    Of course, a wide variety, but the majority
 4   being peanut and peanut by-products, clay pellets and
 5   aggregate, and then -- a lot of other stuff, smaller
 6   volume, and hazardous materials, plastics, wood, ag
 7   products: you know, grain, corn, wheat.
 8      Q    Okay.  What would you consider to be the
 9   railroad's primary market?  Like what -- who do you try
10   to get business from?
11      A    It's more a regional thing.  Wherever your
12   footprint is you try to get business from anybody
13   that's going to have a bulk commodity that will ship.
14      Q    Okay.
15      A    So it's not a commodity group as much as a
16   territorial thing.  Railroads, you're limited to
17   operating on your footprint, so anyone that would ship
18   or receive a bulk commodity within our footprint.
19      Q    Okay.  Who are some of your representative
20   clients?
21      A    Are you asking who our customers are?
22      Q    Yes.
23      A    Golden Peanut would be one of the larger
24   ones.
25      Q    Are they here in Georgia?
```

                              5

```
 1      A    Yes.
 2      Q    Okay.
 3      A    And Alabama.  Carbo (phonetic) Ceramics in
 4   Eufaula to Cinderlo Curly (phonetic); they're bulk in
 5   materials that are primarily -- I mean, they're on the
 6   Georgia side, but -- and then we get into, you know, a
 7   lot smaller ones.
 8      Q    Okay.  And is this a Class I railroad?
 9      A    No.
10      Q    What classification --
11      A    Class III.
12      Q    Class III?  Okay.  And generally, what does
13   that mean?
14      A    That we have less than $22 million of gross
15   revenue annually.
16      Q    Okay.  And just a few general questions about
17   who's going to be the most knowledgeable about what
18   areas.  And Adrian's already given me some information
19   on this, but who would know the most about the use of
20   the track prior to the incident that we're here on
21   today?
22      A    As far as use, it -- really, any -- myself,
23   Dave, or Jason.
24      Q    Okay.
25      A    And Terry would know what usage had been out
```

                              6

```
 1   there.
 2      Q    Okay.  How about the maintenance of the track
 3   from the time that it was built until now?
 4      A    The -- well, from the time it was built, you
 5   know, we could not speak on that.
 6      Q    Okay.
 7      A    But in terms of, you know, the last, you
 8   know, five or six years, then, of course --
 9      Q    Okay.
10      A    -- within that.
11      Q    Let me ask you:  How long has Georgia
12   Southwest Railroad owned that particular track?
13      A    Well, technically, Georgia Southwestern does
14   not own that piece of track.
15      Q    Okay.  Who owns it?
16      A    The Georgia Southwest Corporation, who then,
17   in turn, leases it to the Norfolk Southern.
18      Q    Okay.
19      A    Who then, in turn, leases it to the Georgia
20   Southwestern Railroad, who then we have the maintenance
21   responsibility.
22      Q    Okay.  So explain that to me one more time.
23           Who actually owns it?
24      A    Georgia Southwest Corporation.
25      Q    Okay.  Who are they?  Are they affiliated
```

                              7

```
 1   with y'all?
 2      A    No.  And they're one of the -- they're one of
 3   the companies involved with Norfolk Southern.
 4      Q    Okay.  So that's a --
 5      A    For practical purposes, Norfolk Southern
 6   Companies own it and lease it to the Georgia
 7   Southwestern Railroad, Inc.
 8      Q    Okay.  So basically, y'all are responsible
 9   for the maintenance of the --
10      A    Yes.
11      Q    -- railway?
12      A    Yes.
13      Q    Okay.  Is that part of your lease
14   agreement --
15      A    Yes.
16      Q    -- with them?
17           Do you have a written lease with them?
18      A    Yes.
19      Q    Okay.  What are the general terms of that
20   lease?
21      A    In regards to what?
22      Q    Use, maintenance, how long the lease is, what
23   it's for, what the lease is for.
24      A    The lease is for the purpose of the Georgia
25   Southwestern Railroad Company to provide common carrier
```

                              8

```
 1    Q    Yes, sir.
 2    A    No.
 3    Q    Okay. Did anybody from your office go there
 4  on a regular basis?
 5    A    Just on a required basis.
 6    Q    Okay. So just whenever they were required to
 7  inspect the track? Would that be fair to say?
 8    A    You said anyone, so --
 9    Q    Anybody from the office.
10    A    You mean the company?
11    Q    Yes, sir.
12    A    Yeah. It would be on a required basis.
13    Q    Okay. And would you dispute that there was
14  any vegetation growing on the trestle prior to the
15  fire?
16    A    No.
17    Q    Would you dispute that the presence of
18  vegetation -- this was in the winter. This fire
19  occurred in the winter. We all know most vegetation
20  dies in the winter. Would you dispute that that could
21  cause problems if fire were present around that
22  vegetation? That's a bad question.
23         Would you dispute that that could add fuel to
24  a fire? That the vegetation, the dead vegetation,
25  could add fuel to a fire?
```
41

```
 1    A    I believe what you're asking me is: Would
 2  vegetation -- dry vegetation be fuel for a fire?
 3    Q    Right.
 4    A    I believe that to be true.
 5    Q    Okay. And if it's on the trestle, then that
 6  could be a contributing factor to the trestle catching
 7  on fire and becoming damaged?
 8    A    No.
 9    Q    You don't think that could be a contributing
10  factor?
11    A    Just going along with your question, you
12  know, to my knowledge, fire requires oxygen, fuel, and
13  heat, and fuel by itself would not ignite.
14    Q    Okay. Would you say it would be less likely
15  for the trestle to catch on fire if they were -- okay.
16  Would it be more or less likely for the trestle to
17  catch on fire, in your opinion, if it did not have
18  vegetation growing on it?
19    A    Not necessarily, considering that the trestle
20  is made out of the same material as dead vegetation.
21    Q    No. Would it be more or less likely in your
22  opinion?
23    A    I think it would be the same.
24    Q    So you don't think that dead vegetation on
25  wood could in any way add fuel to a fire if the wood
```
42

```
 1  were going to catch on fire?
 2    A    Well, how would you define -- well, first of
 3  all, in this context, a tree is dead vegetation.
 4    Q    Sure.
 5    A    The bridge is made of dead vegetation, so
 6  having more dead vegetation, would that increase or
 7  decrease the likelihood? I don't know that it would.
 8  It might change the size of your fire.
 9    Q    Okay. Do you claim that Mr. Mitchell had any
10  responsibility to keep the area around the trestle
11  clear of debris or vegetation?
12    A    No.
13    Q    Okay. Do you agree that that was the
14  railroad's responsibility?
15    A    No.
16    Q    Whose responsibility is it?
17    A    I don't know that it's anyone's.
18    Q    So you could just let trees grow up on the
19  railroad track and the railroad trestle?
20    A    You could not let trees grow up -- what -- be
21  more specific. Within what parameters?
22    Q    Just a tree in the middle of the track. I
23  mean, you can't let that happen, can you?
24    A    No. You cannot have a tree in the gauge of
25  the track.
```
43

```
 1    Q    Okay. But, again, you don't claim that
 2  Mr. Mitchell had any responsibility to keep that away
 3  from the trestle?
 4    A    Keep what away?
 5    Q    Keep the vegetation off the railroad trestle.
 6    A    No. He did not, no.
 7    Q    Explain to me exactly what it is that you
 8  claim Mr. Mitchell did wrong in this case.
 9    A    He let his fire get onto our property.
10    Q    Okay. And how do you know that that's what
11  occurred?
12    A    Because he said it did.
13    Q    Okay. Tell me about all the conversations
14  that you've had with Mr. Mitchell.
15    A    I believe that I've only had one phone
16  conversation with him directly.
17    Q    Okay. What was said by you, and what was
18  said by him?
19    A    I did not, you know, keep accurate notes at
20  the time.
21    Q    Okay. But just from your recollection.
22    A    My recollection, it was the time just after
23  this fire and --
24    Q    Okay.
25    A    -- I had a conversation with him in terms of
```
44