

## SMITHVILLE, GA TO WHITE OAK, AL
## LEASE AND OPTION TO PURCHASE AGREEMENT

THIS INDENTURE OF LEASE and OPTION TO PURCHASE AGREEMENT is made this 22nd day of Dec., 1988, by and between Central of Georgia Railroad Company, a Georgia corporation and The South Western Rail Road Company, a Georgia corporation (hereinafter jointly and severally referred to as Lessor) and South Carolina Central Railroad Co., Inc. (hereinafter Lessee).

### WITNESSETH:

WHEREAS, Lessor is the owner of a line of railroad including real property, railroad right of way, railroad facilities, and appurtenances located thereon and affixed thereto between Milepost S-275 at Smithville, Georgia, and Milepost S-349.00 at the end of the line near White Oak, Alabama; and

WHEREAS, Lessor considers said line of railroad to be only marginally profitable, under the circumstances cannot justify reinvestment in said line of railroad, and considers said line of railroad to be a likely candidate for abandonment; and

WHEREAS, as an alternative to abandonment and permanent cessation of rail service over said line of railroad, Lessor



EXHIBIT

2

desires to lease said line of railroad to Lessee for continued operation of rail service  and to grant to Lessee the option to purchase said line of railroad for continued operation of rail service, and Lessee desires to lease and operate said line of railroad as a rail carrier of freight and to acquire the option to purchase said line of railroad, upon the terms and conditions set forth herein;

NOW, THEREFORE, in consideration of the premises, the mutual covenants, and the other good and valuable considerations set forth herein, Lessor and Lessee agree as follows:

1.  Property Leased and Term

(a) Lessor hereby does let to Lessee and Lessee hereby does hire of Lessor the line of railroad of Lessor between Milepost S-275 at Smithville, Lee County, Georgia, and Milepost S-349.00 near White Oak, Barbour County, Alabama, as well as that portion of Central of Georgia's trackage extending northwest of Eufaula along the Montgomery Highway for a distance of approximately five (5) miles to Milepost S-339, including and all in "AS IS, WHERE IS" CONDITION AND WITHOUT ANY EXPRESS OR IMPLIED WARRANTIES, INCLUDING BUT NOT LIMITED TO ANY WARRANTIES OF MERCHANTABILITY, HABITABILITY, OR FITNESS FOR A PARTICULAR PURPOSE, the real property, railroad right of way, road bed, main track, sidings, industrial tracks, depots, yards, storage and parking areas, culverts, bridges, buildings,

3

structures, communication and signal facilities, fixtures, and
all other appurtenances located between said mileposts
(hereinafter the White Oak Line).

(b) On the Commencement Date provided for in Article
20(a) of this Agreement, Lessor will deliver to Lessee
possession of the White Oak Line for Lessee's lease and
operation. Lessor shall have the right to either remove all
track material, equipment, locomotives and other rolling stock
of Lessor located on but not affixed to the White Oak Line
prior to the Commencement Date, or, in the alternative, to take
all such track material equipment, locomotives and other
rolling stock of Lessor and place it at one off main-line
location on the White Oak Line prior to the Commencement Date;
if Lessor shall choose the second alternative, Lessor agrees
that it will segregate and mark such material, et al., and then
remove such segregated, marked material from the White Oak Line
within three (3) months after the Commencement Date;

(c) The term of the lease of the White Oak Line to
Lessee will be twenty (20) years (hereinafter Annual Periods)
from the Commencement Date provided for in Article 20(a) of
this Agreement;

(d) If, subject to the right of Lessor to seek
removal of Lessee from the White Oak Line by all applicable

4

legal means, Lessee holds over or remains in possession of the
White Oak Line after the expiration of Lessee's lease of the
White Oak Line, other than by exercise of Lessee's option to
purchase the White Oak Line granted in Article 14 of this
Agreement, such holding over or continued possession will
create a tenancy from month to month only, and monthly rental
for such period will be equal to one-twelfth (1/12th) of the
Annual Rental provided for in Article 2(a) of this Agreement
and will be payable as set forth in Article 2(e) of this
Agreement; and

(e) If Lessee exercises its option to purchase the
White Oak Line granted in Article 13 of this Agreement,
Lessee's lease of the White Oak Line will terminate on the
Closing Date provided for in Article 20(b) of this Agreement.

## 2. Annual Rental

(a) As rental for Lessee's lease of the White Oak
Line, Lessee will pay to Lessor (or whomever has the right to
collect rent as owner, designee, or assignee of Lessor's rights
under this Agreement) Four Hundred Thirty-Five Thousand Dollars
($435,000.00) per Annual Period (hereinafter Annual Rental);

(b) During the term of Lessee's lease of the White
Oak Line, Annual Rental may be reduced by the amounts

5

calculated pursuant to the table in Exhibit A to this
Agreement, which is attached hereto and made a part hereof
(hereinafter Lease Credits);

(c) For purposes of calculating Lease Credits
pursuant to Exhibit A of this Agreement, the number of car
credits during an Annual Period will be based on the number of
loaded cars of freight handled by Lessor in line haul service
(excluding overhead traffic), handled by Lessee to or from a
customer on the White Oak Line, and interchanged between Lessor
and Lessee at a point on the White Oak Line during that Annual
Period; each such loaded car handled by Lessee to or from
stations west of the Chattahoochee River, MP S-333, will be
given two car credits and all other loaded cars will be given
one car credit;

(d) If, during an annual Period of Lessee's lease of
the White Oak Line, the total amount of Lease Credits earned
during any such Annual Period exceeds the Annual Rental for
that Annual Period, Lessee may reduce the Annual Rental for the
next Annual Period by all or a portion of the amount of such
excess Lease Credits;

(e) Annual Rental for each Annual Period will be due
and payable by Lessee no later than thirty (30) days after

6

Lessee's receipt of an invoice for Annual Rental from Lessor.
Lessor will prepare and submit such invoice to Lessee as soon
after each anniversary date of the Commencement Date provided
for in Article 20(a) of this Agreement as information necessary
to calculate Lease Credits is available to Lessor.  Lessee's
payment of Annual Rental may be by wire transfer to Lessor's
account at Sovran Bank, N.A., Roanoke, Virginia, or by
cashier's or certified check sent by registered or certified
mail, return receipt requested, to the office of the Treasurer
of Lessor at 8 North Jefferson Street, Roanoke, Virginia 24042
or such other accounts or places as may be designated in
writing by Lessor (or whomever has the right to collect rent as
owner, designee, or assignee of Lessor's rights under this
Agreement);

(f) The Annual Rental due for the Annual Period
beginning on the Commencement Date or the most recent
anniversary date thereof and ending on the day specified in any
notice of the termination of Lessee's lease of the White Oak
Line pursuant to Article 28 of this Agreement or on the date of
expiration of Lessee's lease of the White Oak Line will be
considered as having been earned, and Lessee will pay such
Annual Rental, less any Lease Credits earned during such Annual
Period, no later than ten (10) days after issue of such notice,
or upon expiration of Lessee's lease of the White Oak Line, no

7

later than thirty (30) days after Lessee's receipt of an
invoice for such Annual Rental from Lessor; provided, however,
that Lessee shall have no duty to pay rental for the period
between Lessee's filing with the Interstate Commerce Commission
or any other regulatory agency with jurisdiction for any
necessary certificate of public convenience and necessity or
other approvals or exemptions from regulations for
discontinuance of operations over the entire White Oak Line as
provided in Article 3 hereof and the actual discontinuance of
operations, provided, further, however, that Lessee shall be
required to prosecute any such filings with diligence and that
this rental abatement will not be effective if Lessee shall
withdraw such filings and continue operations.  In the event
this Lease terminates other than at the end of an Annual
Period, Lessee shall be entitled to a pro-rate adjustment of
the Annual Rental.  Payment for such Annual Rental will be by
one of the methods set forth in Paragraph (e) of this Article;
and

(g) Acceptance by Lessor (or whomever has the right
to collect rent as owner, designee, or assignee of Lessor's
rights under this Agreement) of Annual Rental paid by Lessee
pursuant to this Article will not be taken or construed to be a
waiver of any provision of this Agreement.

3.  **Nature of Lessee's Use of the Leased Line and
    Discontinuance of Service by Lessee**

(a) During the term of Lessee's lease of the White

8

Oak Line, Lessee will use the White Oak Line to provide service
as a rail carrier of freight only and for any other lawful
purpose consistent with maintaining rail carrier service along
the White Oak Line;

(b) During the term of Lessee's lease of the White
Oak Line, Lessee will not suspend or discontinue its operation
as a rail carrier of freight over all or any part of the White
Oak Line without first applying for and obtaining from the ICC
and any other regulatory agency with jurisdiction any necessary
certificate of public convenience and necessity or other
approvals or exemptions from regulation for such discontinuance
of operations over the White Oak Line; provided, however, that
Lessee will not seek such regulatory authority, or if no
regulatory authority is needed take any action to suspend or
discontinue its operations on the White Oak Line, without first
giving Lessor sixty (60) days' notice of Lessee's intent to do
so; and

(c) Upon suspension or discontinuance of Lessee's
operations as a rail carrier of freight over all or any part of
the White Oak Line during the term of Lessee's lease of the
White Oak Line, whether or not pursuant to necessary and proper
regulatory authority as required by Paragraph (b) of this
Article, Lessee promptly will relinquish to Lessor possession

9

of the White Oak Line, and this Agreement will terminate as
provided by Article 29(i) of this Agreement.

## 4. Income and Expenses Relating to Leased Line

(a) Any income accrued prior to the Commencement Date
provided for in Article 20(a) of this Agreement from the White
Oak Line, any rents and payments accrued prior to the
Commencement Date provided for in Article 20(a) of this
Agreement from any agreements, easements, or licenses
pertaining to the White Oak Line, and any claims, expenses, and
liabilities which arise or are accrued prior to the
Commencement Date provided for in Article 20(a) of this
Agreement in respect of the White Oak Line will belong to, be
paid to, and be the responsibility of Lessor, and it will be
the obligation of Lessor to collect such income, rents, and
payments and to pay or otherwise resolve such claims, expenses,
and liabilities;

(b) Any income accrued on or subsequent to the
Commencement Date provided for in Article 20(a) of this
Agreement from rail carrier service along the White Oak Line
and any claims, expenses, and liabilities which arise or are
accrued on or subsequent to the Commencement Date provided for
in Article 20(a) of this Agreement in respect of the White Oak

10

Line, excluding agreements, easements, and licenses pertaining to the White Oak Line and not necessary for or related to rail operations and those additional easements retained by Lessor pursuant to Article 22 of this Agreement, will belong to, be paid to, and be the responsibility of Lessee, and it will be the obligation of Lessee to collect such income and to pay or otherwise to resolve such claims, expenses, and liabilities. Within six (6) months of the Commencement Date provided for in Article 20(a) of this Agreement, Lessor will arrange for the assignment to Lessee of those third party agreements which



Lessor, in its sole good faith judgment, determines are necessary and applicable to the operation by Lessee of the White Oak Line; subject to Amtrak, such assignment will be for a period equal to the term of the lease of the property covered by the applicable third party agreement, or at most, the term of this lease as specified in Article 1(c) hereof;

(c) Any income, rents, and payments accrued on or subsequent to the Commencement Date provided for in Article 20(a) of this Agreement and during the term of Lessee's lease of the White Oak Line from any agreements, easements, or licenses pertaining to the White Oak Line and not necessary for or related to rail operations and from those additional easements retained by Lessor pursuant to Article 22 of this Agreement and any claims, expenses, and liabilities which arise

11

or are accrued on or subsequent to the Commencement Date
provided for in Article 20(a) of this Agreement and during the
term of Lessee's lease of the White Oak Line in respect of any
agreements, easements, or licenses pertaining to the White Oak
Line and not necessary for or related to rail operations and
those additional easements retained by Lessor pursuant to
Article 22 of this Agreement will belong to, be paid to, and be
the responsibility of Lessor, and it will be the obligation of
Lessor to collect such income, rents, and payments and to pay
or otherwise to resolve such claims, expenses, and liabilities;

      (d) (i) Property taxes and assessments relating to
the White Oak Line will be prorated as of the Commencement Date
provided for in Article 20(a) of this Agreement. If the actual
amount due for taxes for the calendar year during which said
Commencement Date occurs is not available on or before said
Commencement Date, proration will be based upon the amount of
taxes or assessments against the White Oak Line during the
calendar year prior to the calendar year in which said
Commencement Date occurs with any necessary adjustment to be
made between Lessor and Lessee when the actual amount due for
the calendar year in which said Commencement Date occurs
becomes known. All special taxes or assessments for
improvements made prior to the Commencement Date provided for
in Article 20(a) of this Agreement will be paid by Lessor;

12

(ii) After the Commencement Date provided for in Article 20(a) of this Agreement and during the term of Lessee's lease of the White Oak Line, Lessee will pay when due and prior to the imposition of any penalties all licenses, taxes, levies, or assessments of whatever kind or nature which may become a lien against the White Oak Line.  Lessee further agrees to indemnify lessor against any liability for payment of the same.  Nothing in this paragraph shall be construed to diminish Lessee's rights under Virginia or Alabama law to contest any such license, tax, levy, or assessment in appropriate judicial or administrative proceedings;

(iii) Lessee will present to Lessor for inspection the official receipts (or photocopies thereof) showing the payment of any of such licenses, taxes, levies, and assessments; and

(iv) Promptly upon receipt of an itemized statement, Lessee will reimburse Lessor for any such licenses, taxes, levies, or assessments paid by Lessor which are the responsibility of Lessee, and upon request by Lessee, Lessor will present to Lessee for inspection the official receipts (or photocopies thereof) showing the payment of any of such licenses, taxes, levies, and assessments;

(e) Beginning on the Commencement Date provided for in Article 20(a) of this Agreement and during the term of

13

Lessee's lease of the White Oak Line, Lessee will pay all bills for water, sewer, gas, and electric service to the White Oak Line, excluding service attributable solely to any agreements, easements, and licenses pertaining to the White Oak Line that are not assigned to Lessee and those additional easements retained by Lessor pursuant to Article 22 of this Agreement. In the event that such bills cover the White Oak Line and other facilities, the parties shall be responsible for payment of their proportional interest. If Lessor is at any time required to pay such bills, Lessee promptly will reimburse Lessor upon receipt of a bill or bills therefor; and

(f) If during the term of Lessee's lease of the White Oak Line, the White Oak Line or any part thereof is appropriated or otherwise acquired by a governmental body or agency thereof or by a quasi-public body, all awards or compensation for such appropriation or acquisition will be paid solely to Lessor, and Lessee's lease of the White Oak Line and option to purchase the White Oak Line granted in Article 13 of this Agreement will terminate as to such property, with an appropriate abatement of rental or purchase price to be applied in the case of a partial taking.

## 5.   Maintenance of Leased Line

(a) During the term of Lessee's lease of the White Oak Line, at Lessee's sole cost and expense, Lessee properly

14

will maintain the White Oak Line in a condition equal or superior to the condition of the White Oak Line on the Commencement Date provided for in Article 20(a) of this Agreement, normal wear and tear excepted; provided, however, that Lessee may relocate switches and industrial tracks from one location on the White Oak Line to another location on the White Oak Line with any necessary and proper regulatory authority and after ten (10) days' written notice to Lessor. Subject to Lessee's rights under Articles 2(f) and 28(k), any rehabilitation or reconstruction, including but not limited to that necessitated by an Act of God, will be the sole responsibility of Lessee. Such maintenance will include any function which Lessor, but for this Agreement, would be required to perform pursuant to applicable federal, state, and municipal laws, ordinances, and regulations; and

(b) Lessee will pay, satisfy, and discharge all claims or liens for material and labor or either of them used, contracted for, or employed by Lessee during the term of Lessee's lease of the White Oak Line in the construction, repair, maintenance, or removal of the White Oak Line and any improvements located thereon, whether said improvements are the property of Lessor or of Lessee, and Lessee will indemnify and save harmless Lessor from all such claims, liens, or demands whatsoever.

15

## 6. Compliance with Laws, Handling of Wastes

(a) During the term of Lessee's lease of the White Oak Line, Lessee will comply with applicable federal, state, and municipal laws, ordinances, and regulations;

(b) During the term of Lessee's lease of the White Oak Line, Lessee will comply with all federal, state, and local laws, rules, regulations, and ordinances controlling air, water, noise, hazardous waste, solid waste, and other pollution or relating to the storage, transport, release, or disposal of hazardous materials, substances, waste, or other pollutants. At its own expense Lessee will make all modifications, repairs, or additions to the White Oak Line, install and bear the expense of any and all structures, devices, or equipment, and implement and bear the expense of any remedial action which may be required under any such laws, rules, regulations, ordinances, or judgments;

(c) During the term of Lessee's lease of the White Oak Line, Lessee will not dispose of any wastes of any kind, whether hazardous or not, on the White Oak Line;

(d) Lessee will furnish Lessor written notice of any and all releases of hazardous wastes or substances which occur during the term of Lessee's lease of the White Oak Line

16

whenever such releases are required to be reported to any federal, state, or local authority. Such written notice will identify the substance released, the amount released, and the measures undertaken to clean up and remove the released material and any contaminated soil or water and will demonstrate to Lessor's reasonable satisfaction that the property has been restored to a condition acceptable to those government regulatory agencies having jurisdiction over the property. Lessee also will provide Lessor with copies of any and all reports made to any governmental agency which relate to such releases during the term of Lessee's lease of the White Oak Line;

(e) During the term of Lessee's lease of the White Oak Line, Lessor will have the right to enter the White Oak Line for the purpose of inspecting the White Oak Line to ensure compliance with the requirements of this Article. If Lessor detects any violation, including any contamination of the White Oak Line, Lessor will notify Lessee of the violation. Upon receipt of such notice Lessee will take immediate steps to eliminate the violation to the satisfaction of Lessor. Should Lessee inadequately remedy or fail to eliminate the violation, Lessor or its representative will have the right to enter the White Oak Line and to take whatever corrective action Lessor deems necessary to eliminate the violation, at the sole expense of Lessee;

17

(f) Regardless of any acquiescence by Lessor, Lessee will (i) indemnify and hold harmless Lessor and its officers, agents, employees, lessors, parent corporation, subsidiaries, affiliates, successors, and assigns from all liability, costs, expenses, fines, or penalties resulting from any violation of any federal, state, or local law, rule, regulation, or ordinance controlling air, water, noise, hazardous waste, solid waste, or other pollution or relating to the storage, transport, release, or disposal of hazardous materials, substances, wastes, or other pollutants relating to the White Oak Line or Lessee's lease and operation thereof and from any violations of this Article, (ii) reimburse Lessor and its officers, agents, employees, lessors, parent corporation, subsidiaries, affiliates, successors, and assigns for all costs and expenses incurred by Lessor or its officers, agents, employees, lessors, parent corporation, subsidiaries, affiliates, successors, and assigns in eliminating or remedying such violations, pollution, or contamination, (iii) reimburse and hold harmless Lessor and its officers, agents, employees, lessors, parent corporation, subsidiaries, affiliates, successors, and assigns from any and all costs, expenses, attorneys' fees, and penalties, fines, or civil judgments sought or obtained against Lessor or its officers, agents, employees, lessors, parent corporation, subsidiaries, affiliates, successors, and assigns as a result of Lessee's

18

lease and operation of the White Oak Line or any release or disposal of any hazardous material, substance, waste, or other pollutant onto or into the ground or into the water or air from or upon the White Oak Line, and (iv) will procure and maintain in effect during the term of Lessee's lease of the White Oak Line and in a manner consistent with the requirements of the Interchange Agreement referred to in Article 12(a) hereof a policy or policies of insurance covering the liability to which Lessee is or may be subject under this Article;

(g) Lessee waives and will not assert as a defense any statute of limitations applicable to any controversy or dispute arising under this Article, and Lessee will not raise or plead a statute of limitations defense against Lessor in any action arising out of Lessee's failure to comply with this Article; and

(h) Nothing in this Article shall impose liability on Lessee for any act or occurrence arising prior to the date of this lease.

7. Liability

Except as otherwise provided in Articles 13 and 14 of the Interchange Agreement to be entered into between Lessee and

19

Lessor on or before the Commencement Date provided for in
Article 20(a) of this Agreement, the liability of the parties
hereto, as between themselves, for death, personal injury, or
property damage will be determined as follows:

(a) Except where the sole proximate cause of such
injury, death, loss, or damage is the negligence of Lessor,
Lessee will indemnify and save harmless Lessor and its
officers, agents, employees, lessors, parent corporation,
subsidiaries, affiliates, successors, and assigns from and
against any and all loss, damage, claims, expense, including
attorney's fees, or liability for:  (i) injury to or death of
any person occurring on or about the White Oak Line during the
term of or in connection with Lessee's lease thereof; and (ii)
loss of or damage to any property whatsoever, including, but
not limited to, the property covered by Lessee's lease of the
White Oak Line, where such loss or damage is caused by, arises
out of, results from or is incident to (A) the condition or
existence of the property covered by Lessee's lease of the
White Oak Line or (B) Lessee's lease, use, or operation of such
property or any portion thereof; and

(b) Notwithstanding the provisions of Paragraph (a)
of this Article, Lessee will be absolutely responsible for and
will indemnify and save harmless Lessor and its officers,

20

agents, employees, lessors, parent corporation, subsidiaries, affiliates, successors, and assigns from all liability claims, penalties, fines, expenses, damages, and costs, including attorneys' fees, arising from Lessee's violation of or from its failure to comply with any provisions of this Agreement, regardless of any negligency of lessor, its officers, agents, employees or affiliates contributing thereto; and

(c) Nothing in this Article 7 shall impose liability of any nature on Lessee for any injury, death, or damage occurring or attributable to an occurrence prior to the Commencement Date of this lease.

8. <u>No Covenant of Quiet Enjoyment</u>

Nothing in this Agreement implies or imports a covenant by Lessor for quiet enjoyment by Lessee of the White Oak Line during the term of Lessee's lease of the White Oak Line, and nothing in this Agreement implies or imports any representation by Lessor that the fee title to the White Oak Line is owned by Lessor, provided, however, that Lessor does represent that the White Oak Line is currently operated as a continuous line of railroad. During the term of this lease, Lessor will not grant others rights in the White Oak Line which are inconsistent with Lessee's use of the White Oak Line.



21

## 9. Certain Obligations of Lessee

(a) On the Commencement Date provided for in Article 20(a) of this Agreement, Lessee will assume all common carrier responsibility and obligation for the White Oak Line, including performance of rail carrier service along the White Oak Line, and Lessor carrier shall have no further right to provide common carrier service;

(b) On or prior to the date of this Agreement, Lessee will obtain appropriate corporate approvals for Lessee's lease of the White Oak Line, and acceptance of the option to purchase the White Oak Line granted in Article 13 of this Agreement, and certified copies of records of necessary corporate proceedings or documents will be provided to Lessor within fifteen (15) days after request by Lessor. Lessee represents and warrants that it is properly incorporated in the State of South Carolina and that Lessee is authorized to do business in the States of Alabama and Georgia;

(c) On or prior to the date of Lessee's exercise of the option to purchase the White Oak Line granted in Article 13 of this Agreement, Lessee will obtain appropriate corporate approvals for Lessee's purchase and operation of the White Oak Line, and certified copies of records of necessary corporate proceedings or documents will be provided to Lessor simultaneously with Lessee's notice of exercise of the option to purchase pursuant to Article 13(d) of this Agreement.

22

Within thirty (30) days after Lessee exercise of the option to purchase the White Oak Line granted in Article 13 of this Agreement, Lessee will provide Lessor with evidence satisfactory to Lessor of Lessee's ability to pay the purchase price for the White Oak Line set forth in Article 14(a) of this Agreement;

(d)  Within thirty (30) days after the date of this Agreement, Lessee will provide Lessor with evidence satisfactory to Lessor of Lessee's ability to (i) pay the rental for the White Oak Line set forth in Article 2(a) of this Agreement and (ii) maintain working capital sufficient for its proposed operations, which evidence may consist of pro forma financial statements for Lessee's proposed operations or a commitment letter by a bank or other financial institution to provide Lessee with funds to meet Lessee's obligations under this Agreement; and

(e)  Within thirty (30) days after the date of this Agreement, Lessee will provide Lessor with evidence of Lessee's ability to operate the White Oak Line as a rail carrier of freight, which evidence may consist of Lessee's employment of or contract with an experienced operator of short line rail freight service.

## 10.  Certain Obligations of and Responsibilities by Lessor

(a)  **Lessor represents and warrants that with the**

23

exception of the Central of Georgia Railway Company First
Mortgage of January 1, 1948 no mortgage is a lien against the
Property, and this Lease is subject to the terms of that
mortgage.

(b)   Lessor acknowledges that appropriate corporate
approvals are required for Lessor to lease the White Oak Line
to Lessee and to grant to Lessee the option to purchase the
White Oak Line granted in Article 13 of this Agreement, and
Lessor will use its best efforts to obtain such corporate
approvals and to provide to Lessee certified copies of records
of necessary corporate proceedings or documents at least
fifteen (15) days prior to the Commencement Date provided for
in Article 20(a) of this Agreement;

(c) Lessor acknowledges that appropriate corporate
approvals are required for Lessor to convey the White Oak Line
to Lessee, and Lessor will use its best efforts to obtain such
corporate approvals and to provide to Lessee certified copies
of records of necessary corporate proceedings or documents at
least thirty (30) days prior to the Closing Date provided for
in Article 20(b) of this Agreement;

(d) Until the Commencement Date provided for in
Article 20(a) of this Agreement, Lessor will (i) maintain the
White Oak Line in condition suitable for its current
operations, (ii) refrain after the date of this Agreement from
changing or removing tracks or other facilities currently
included in and affixed to the White Oak Line or permitting new

24

encumbrances or liens from attaching to the White Oak Line without the consent of Lessee, which consent will not be withheld unreasonably, and (iii) continue to conduct its business along the White Oak Line in the current manner;

(e) Lessor will not perform and will not be required to perform any rehabilitation or extraordinary maintenance on the White Oak Line during Lessor's continued operation pursuant to Paragraph (d) of this Article;

(f) Lessor represents that it is not a party to any contract or arrangement, except as set forth in this Agreement, which gives any third party a right superior to that of Lessee to lease and operate the White Oak Line;

(g) Lessor agrees to fully assist Lessee in Lessee's fulfillment of the historic reporting requirements of 49 CFR §1105.7.


11. **Employees**

(a) Lessee is not obligated under this Agreement to

25

hire any employee of Lessor in service on the White Oak Line or elsewhere who is unwilling to accept employment under terms and conditions satisfactory to Lessee or who may not be employed by Lessee under or by virtue of the operation of any applicable labor agreement; provided, however, that Lessee will use its reasonable best efforts to make available to Lessor's employees in service on the White Oak Line positions with Lessee's operation as a rail carrier of freight on the White Oak Line; and

(b) Unless Lessee or Lessor elects to terminate this Agreement pursuant to Article 28(c), (d), (e), or (f) of this Agreement, Lessee will bear any and all costs of protection of its current or future employees, including former employees of Lessor employed by Lessee, arising from any protective conditions imposed by the ICC, any other regulatory agency, or statute upon Lessee's lease and operation or purchase of the White Oak Line or arising from any agreements or arrangements entered into by Lessee or Lessor and Lessee in respect of those employees. Unless Lessee or Lessor elects to terminate this Agreement pursuant to Article 28(c), (d), (e) or (f), Lessor will bear any and all costs of protection of employees of Lessor or its affiliates in service on the White Oak Line on the Commencement Date provided for in Article 20(a) of this Agreement, except those former employees of Lessor who are offered and accept employment with Lessee, arising from any

26

protective conditions imposed by the ICC, any other regulatory agency, or statute upon Lessee's lease and operation or purchase of the White Oak Line or arising from any agreements or arrangements entered into by Lessor or Lessor and Lessee in respect of those employees.

## 12. Interchange Agreement, Lessee Monthly Statement

(a) On or before the Commencement Date provided for in Article 20(a) of this Agreement, Lessor and Lessee will enter into an interchange agreement to govern Lessee's access to Lessor's computer services, interchange, handling charges, and related matters; and

(b) On a monthly basis Lessee will provide Lessor, at the address set forth in Article 13(d) of this Agreement, a statement showing car number, tons, STCC, origin, consignor, destination, and consignee for each loaded car handled by Lessor in line haul service and handled by Lessee to or from a customer or to or from a rail carrier other than Lessor on the White Oak Line during the prior month.

## 13. Option to Purchase Leased Line

(a) Lessor hereby grants to Lessee, for the purpose of Lessee's operation as a rail carrier of freight, the

27

exclusive option to purchase the White Oak Line. Included in the White Oak Line, and all in "AS IS, WHERE IS" CONDITION AND WITHOUT ANY EXPRESS OR IMPLIED WARRANTIES, INCLUDING BUT NOT LIMITED TO ANY WARRANTIES OF MERCHANTABILITY, HABITABILITY, OR FITNESS FOR A PARTICULAR PURPOSE, will be all of Lessor's right, title, and interest in the real property, railroad right of way, road bed, main track, sidings, industrial tracks, depots, yards, storage and parking areas, culverts, bridges, buildings, structures, communication and signal facilities, fixtures, and all other appurtenances, except that reserved unto Lessor in Paragraph (b) of this Article, located between the mileposts stated in Article 1(a) of this Agreement as of the date of exercise of the option to purchase granted by this Article;

(b) Excepted and reserved onto Lessor from the conveyance of the White Oak Line are those parcels described in Exhibit B to this Agreement, which is attached hereto and made a part hereof (hereinafter Excepted Rights and Property), as well as those easements retained by Lessor pursuant Article 22 of this Agreement;

.    (c) The option to purchase the White Oak Line granted to Lessee in Paragraph (a) of this Article may be exercised pursuant to Paragraph (d) of this Article at any time

28

on or after the third anniversary date of the Commencement Date provided for in Article 20(a) of this Agreement and will continue in effect during the remainder of the term of Lessee's lease of the White Oak Line set forth in Article 1(c) of this Agreement; provided, however, if Lessee's lease of the White Oak Line pursuant to this Agreement is terminated for any reason, the option to purchase granted in this Article will cease and terminate immediately;

(d) Provided that Lessee is not in default under this Agreement, the option to purchase the White Oak Line granted to Lessee in Paragraph (a) of this Article may be exercised by sending written notice to Lessor by registered or certified mail, return receipt requested, at the following address:

> Central of Georgia Railroad Company
> c/o Director, Corporate Development
> Norfolk Southern Corporation
> One Commercial Place
> Norfolk, Virginia 23510; and

(e) As consideration for the option to purchase the White Oak Line granted in this Article, upon execution and return of this Agreement, Lessee simultaneously will transmit to Lessor, at the address set forth in Paragraph (d) of this Article, Two Thousand Dollars ($2,000.00) in the form of a cashier's or certified check (hereinafter Option Fee).

29

## 14.  Purchase Price

(a) As consideration for sale by Lessor of the White
Oak Line, Lessee will pay Lessor the net liquidation value of
the White Oak Line as of the Closing Date provided for in
Article 20(b) of this Agreement, calculated by the methodology
used by the ICC, as of the date of this Agreement, to determine
the value of a line of railroad pursuant to 49 USC § 10905
(hereinafter Purchase Price); and

(b) Lessor and Lessee understand and agree Lessee
may be required by law to undertake capital improvements or
that Lessee may need to undertake extraordinary maintenance of
an existing structure because that structure cannot be safely
used and requires replacement. Lessee desires to receive a
capital credit for such capital improvements that will be
credited against the sum that will be due to Lessor under the
terms of this Article 14 at such time as the White Oak Line may
be sold to Lessee. Lessor is agreeable to a limited capital
credit, and such limited credit will be awarded as follows, and
on the following terms and conditions:

(i) The capital credit shall be the difference
between the net liquidation value, if any, of the structure
being replaced and the net liquidation value of the new
structure reduced by depreciation using a straight line method,

30

and shall only apply if the capital structure is still in the White Oak Line on the date of closing.

(ii) Capital credits will be made only for those capital improvements required by law or required due to a need for extraordinary maintenance where the same are also reasonably deemed by Lessor as essential to the operation of the White Oak Line, and will not be made if the capital improvements arise out of a need for extraordinary maintenance of an existing structure when the need for such extraordinary maintenance is attributable, directly or indirectly, to the acts or inaction of Lessee.

(iii) Lessee shall submit to Lessor in writing a request that a capital credit be given for a particular capital project. Such request should include Lessee's estimate of the NLV of the structure proposed for construction and explain in detail why Lessee believes the capital project should be undertaken and why the capital project is essential to the continued operation of the White Oak Line. Lessor will then determine the NLV of the existing structure and promptly notify Lessee whether or not Lessor will permit the requested capital credit, such permission by Lessor to not be unreasonably withheld. Should Lessee not obtain permission from Lessor that a capital credit will be granted for a particular capital project, and subject to Lessee's right to seek arbitration of the question under Article 26 hereof, Lessee may proceed to

31

construct the structure in question without benefit of the
capital credit, or, not build the capital structure in question.

(iv) Notwithstanding the provisions of the
foregoing subparagraph (c)(iii), if the entire net liquidation
value of a capital improvement will not exceed $25,000, and
Lessee deems the situation to be an emergency, Lessee may
proceed to do the needed work and then seek the capital credit
from Lessor.

(v) It is understood by Lessee that the net
liquidation value of a capital improvement will not include the
cost of labor or other costs of placing a structure in the
White Oak Line, and also will not include improvements placed
in the line using funds furnished by any governmental entity.

(vi) Once the work is actually completed, Lessee
will notify Lessor of the actual NLV of the new structure,
which submission must include satisfactory supporting data.

(c) On the Closing Date provided for in Article
20(b) of this Agreement, Lessee will wire transfer to Lessor's
account at Sovran Bank, N.A., Roanoke, Virginia, or such other
bank as Lessor shall designate, in full discharge of the
consideration due Lessor by Lessee for purchase of the White
Oak Line, an amount equal to the Purchase Price less the Option
Fee.

32

### 15.  Income, Expense and Indemnity Relating to the Purchase of Leased Line

(a) If Lessee exercises the option to purchase the White Oak Line granted in Article 13 of this Agreement, any income accrued on or subsequent to the Closing Date provided for in Article 20(b) of this Agreement from the White Oak Line and any rents and payments accrued on or subsequent to the Closing Date provided for in Article 20(b) of this Agreement from any agreements, easements, or licenses pertaining to the White Oak Line, excluding those easements retained by Lessor pursuant to Article 22(b) of this Agreement, and any claims, expenses, and liabilities which arise or are accrued on or subsequent to the Closing Date provided for in Article 20(b) of this Agreement in respect of the White Oak Line, excluding those easements retained by Lessor pursuant to Article 22(b) of this Agreement, will belong to, be paid to, and be the responsibility of Lessee, and it will be the obligation of Lessee to collect such income and to pay or otherwise to resolve such claims, expenses, and liabilities;

(b) If Lessee exercises the option to purchase the White Oak Line granted in Article 13 of this Agreement, any income accrued on or subsequent to the Closing Date provided for in Article 20(b) of this Agreement from those easements retained by Lessor pursuant to Article 22(b) of this Agreement and any claims, expenses, and liabilities which arise or are

33

accrued on or subsequent to the Closing Date provided for in
Article 20(b) of this Agreement in respect of those easements
retained by Lessor pursuant to Article 22(b) of this Agreement
will belong to, be paid to, and be the responsibility of
Lessor, and it will be the obligation of Lessor to collect such
income and to pay or otherwise to resolve such claims,
expenses, and liabilities;

(c) On and subsequent to the Closing Date provided
for in Article 20(b) of this Agreement and without regard to
when a violation, release, or disposal occurred or occurs,
Lessee will (i) indemnify and hold harmless Lessor and its
officers, agents, employees, lessors, parent corporation,
subsidiaries, affiliates, successors, and assigns from all
liability, costs, expenses, fines, or penalties resulting from
any violation of any federal, state, or local law, rule,
regulation, or ordinance controlling air, water, noise,
hazardous waste, solid waste, or other pollution or relating to
the storage, transport, release, or disposal of hazardous
materials, substances, wastes, or other pollutants relating to
Lessee's occupancy of and operation over the White Oak Line,
excluding Excepted Rights and Property; (ii) reimburse Lessor
and its officers, agents, employees, lessors, parent
corporation, subsidiaries, affiliates, successors, and assigns
for all costs and expenses incurred by Lessor or its officers,
agents, employees, lessors, parent corporation, subsidiaries,
affiliates, successors, or assigns in eliminating such
violations, pollution, or contamination relating to Lessee's

34

occupancy of and operations over the White Oak Line, excluding Excepted Rights and Property; (iii) reimburse and hold harmless Lessor and its officers, agents, employees, lessors, parent corporation, subsidiaries, affiliates, successors, and assigns from any and all costs, expenses, attorneys' fees, and penalties, fines, or civil judgments obtained against Lessor or its officers, agents, employees, lessors, parent corporation, subsidiaries, affiliates, successors, or assigns as a result of any release or disposal of any hazardous material, substance, wastes, or other pollutant onto or in onto the ground or into the water or air from or upon the White Oak Line during the term of Lessee's leasehold, excluding Excepted Rights and Property; and (iv) make all modifications, repairs, or additions to the White Oak Line, excluding Excepted Rights and Property, install and bear the expense of any and all structures, devices, or equipment, and implement and bear the expense of any remedial action which may be required under any such laws, rules, regulations, ordinances, or judgments; and

(d) The provisions of this Article shall survive the closing of the sale of the White Oak Line.

## 16. Responsibility for Cost Associated with Purchase

Lessor will pay its attorneys' fees, other expenses incurred by it in negotiation and preparation of this Agreement, the cost of deed preparation, the cost of any

35

appraisals it desires. Lessee will pay its attorneys' fees,
other expenses incurred by it in negotiation and preparation of
this Agreement, the cost of any surveys, appraisals, or title
insurance it desires, and all other expenses incident to the
lease, option to purchase, and conveyance of the White Oak
Line, including deed recordation fees, real estate transfer
taxes and fees, and documentary revenue stamps.

## 17. Regulatory Approval

(a) The parties will apply for and obtain from the
ICC and any other regulatory agency with jurisdiction any
necessary approvals or exemptions from regulation for Lessee's
lease and operation and for its purchase of the White Oak Line;
and

(b) Upon request by Lessor or Lessee, Lessor and
Lessee will seek judicial review if the ICC or any other
regulatory agency with jurisdiction declines or fails to grant
any necessary approvals or exemptions from regulation for
Lessee's lease and operation or purchase of the White Oak Line
or grants any such approval or exemption subject to any
condition not acceptable to Lessor or Lessee. Upon request by
Lessor or Lessee, Lessor and Lessee will defend any judicial
action brought by any person challenging or otherwise
contesting any necessary regulatory approval or exemption from
regulation for Lessee's lease and operation or purchase of the
White Oak Line. Each party shall bear their own legal
expenses, subject to the right of either party to notify the

other in writing of its good faith determination to incur no further legal expenses; the other party shall then have ten (10) business days in which to notify in writing the first party that the other party will thereafter pay the expenses incident to the first party's continued participation in the litigation; if no such notice is given, then said first party will be relieved of any further obligation to participate in the subject litigation.

## 18. Title Examination

Prior to the Closing Date provided for in Article 20(b) of this Agreement, Lessee may at its sole cost and expense conduct a title examination of the White Oak Line. If the title examination discloses matters of record, other than the mortgages set forth in Article 10(a) of this Agreement, affecting Lessor's title to the White Oak Line which would materially restrict Lessee's ability to operate the White Oak Line or if Lessee receives notice of any such matter, Lessee will notify Lessor in writing of such matters, and Lessor may elect either to correct or not to correct any such title defects. Lessor will make its election by written notice to Lessee within thirty (30) days of receipt of Lessee's notice of title objections. If Lessor elects to correct such title defects, Lessor will complete its work within ninety (90) days of its election. If Lessor elects not to correct such title defects, if Lessor first chooses to correct such title defects

37

but thereafter decides not to make such corrections, or in any event if all·title defects are not cured within said ninety (90) day period, Lessee may elect either to proceed with the purchase and sale, to terminate this Agreement pursuant to Article 28(1) of this Agreement, or to continue Lessee's lease of the White Oak Line until the end of its twenty (20) year term set forth in Article 1(c) of this Agreement.

## 19. Inspection of Leased Line and Related Records

Upon request by Lessee, Lessor will permit Lessee and its employees or agents, at reasonable times and with reasonable frequency prior to the Commencement Date provided for in Article 20(a) of this Agreement, to inspect the White Oak Line by hi-rail trip or other inspection means.  Upon request by Lessee, records applicable to the White Oak Line such as track charts, contract agreements such as wire line and crossing agreements, and other documentation, but not including transportation contracts, will be made available to Lessee for inspection, and for a reasonable fee to cover costs, photocopying during normal business hours at Lessor's offices where they are maintained.

## 20. Commencement Date and Closing

(a) Lessee will begin operations as a rail carrier of freight and will assume common carrier obligation and responsibility for the White Oak Line within thirty (30) days

38

after the effective date of the regulatory approvals or exemptions contemplated by Article 17 of this Agreement for Lessee's lease and operation of the White Oak Line; (Commencement Date);

(b) If Lessee exercises the option to purchase the White Oak Line granted in Article 13 of this Agreement, transfer of title to the White Oak Line and all matters relating thereto will occur within thirty (30) days after the effective date of the regulatory approvals or exemptions contemplated by Article 17 of this Agreement for Lessee's purchase and operation of the White Oak Line, within thirty (30) days after the correction of any title defects which Lessor undertakes pursuant to Article 18 of this Agreement, or within thirty (30) days following the receipt by Lessor of release of the White Oak Line from those mortgages set forth in Article 10(a) of this Agreement, whichever date is later (Closing Date);

(c) The closing will be at a time and place mutually and reasonably agreed upon by Lessor and Lessee; and

(d) Any obligation set forth in or arising under this Agreement not fully performed on the Commencement Date for those obligations related to Lessee's lease and operation of and option to purchase the White Oak Line and on the Closing Date for those obligations related to the purchase and sale of the White Oak Line will survive the closing.

39

## 21. Other Closing Matters

(a) If Lessee exercises the option to purchase the White Oak Line granted in Article 13 of this Agreement, on the Closing Date and in exchange for delivery by Lessee of the Purchase Price provided for in Article 14 of this Agreement, Lessor will deliver full possession of the White Oak Line to Lessee and will execute and deliver to Lessee the following instruments:

(i) an assignment of all of Lessor's rights in all known leases, side and industrial track agreements, public and private grade crossing agreements, pipeline and wire agreements, licenses, and other agreements directly affecting the White Oak Line, excluding those easements retained by Lessor pursuant to Article 22 of this Agreement;

(ii) a quitclaim deed conveying Lessor's right, title and interest in and to the White Oak Line less those parcels set forth in Exhibit B, subject to taxes and assessments not then due and payable, to easements and restrictions as may appear of record or from an examination of the White Oak Line, and to those easements retained by Lessor pursuant to Article 22 of this Agreement; and

(iii) evidence of the releases from any mortgage which is a lien of record against the White Oak Line with

40

evidence of recordation to be provided to Lessee within thirty
(30) days after the Closing Date;

(b) All income, rents, and payments accrued under all
leases, agreements, licenses, and easements directly affecting
the White Oak Line will be prorated as of the Closing Date in
accordance with Article 15 of this Agreement, and settlement
between Lessor and Lessee for such prorations will occur no
later than one hundred twenty (120) days after the Closing
Date; and

(c) Within thirty (30) days after the Closing Date,
Lessor will deliver to Lessee all original valuation maps,
track charts, bridge and other drawings, bridge inspection
reports, deeds, agreements, leases, and licenses directly
affecting the White Oak Line and in the possession of Lessor,
its parent, or its affiliates; provided, however, that at the
sole discretion of Lessor, copies of such maps, charts,
drawings, and documents may be delivered to Lessee in lieu of
originals.

## 22. Retained Easements

(a) During the term of Lessee's lease of the White
Oak Line, Lessor will have the exclusive right to convey by
deed of easement to itself, to its subsidiaries or affiliates,

41

or to its designees one or more permanent, perpetual,
nonexclusive easements:

(i) to install, construct, operate, maintain,
repair, renew, replace, and remove a fiber optic communication
system over, through, and across the White Oak Line; provided,
however, that Lessee will have the right to use for its
internal railroad communication purposes one hundred (100)
voice channels of the portion of any such fiberoptic
communications system that is placed on the White Oak Line,
with Lessee to bear the cost of equipment and facilities
required to allow its use of such channels and with Lessee's
access to such channels to be on reasonable terms, conditions,
and notice. The easement reserved pursuant to this
Subparagraph will include among other things the right to
install, construct, operate, maintain, repair, renew, replace,
and remove fiber optic cable, associated electronics, computer
shelters, terminal facilities, connection boxes and pull boxes,
and related facilities; the right to install power supply
facilities; the right to attach the fiber optic cable and
related facilities to existing bridges and to install it in
existing tunnels; and the right of ingress and egress for
access purposes; and

(ii) to install, construct, operate, maintain,
repair, renew, replace, and remove pipelines or wirelines over,
under, on, or across the White Oak Line, including among other

42

things the right to install, construct, operate, maintain, repair, renew, replace, and remove associated and related facilities; the right to attach the pipelines and wirelines and associated and related facilities to existing bridges and to install them in existing tunnels; and the right of ingress and egress for access purposes; and

(b) If Lessee exercises the option to purchase the White Oak Line granted in Article 13 of this Agreement, Lessor will have the right to convey, by deed of easement prior to the conveyance to Lessee or by reservation in the conveyance to Lessee, to itself, to its subsidiaries or affiliates, or to its designees one or more permanent, perpetual, and nonexclusive easements, provided, that any such easement granted after the Commencement Date of this lease for a pipeline or wire line shall, as between the parties hereto, be granted at the sole risk of Lessor:

(i) to install, construct, operate, maintain, repair, renew, replace, and remove a fiber optic communication system over, through, and across the White Oak Line.  The easement reserved pursuant to this Subparagraph will include among other things the right to install, construct, operate, maintain, repair, renew, replace, and remove fiber optic cable, associated electronics, computer shelters, terminal facilities, connection boxes and pull boxes, and related facilities; the right to install power supply facilities; the right to attach

43

the fiber optic cable and related facilities to existing
bridges and to install it in existing tunnels; and the right of
ingress and egress for access purposes; and

(ii) to install, construct, operate, maintain,
repair, renew, replace, and remove pipelines over, under, or on
and running parallel to the White Oak Line right of way for a
distance of one (1) mile or more, including among other things
the right to install, construct, operate, maintain, repair,
renew, replace, and remove associated and related facilities
and the right of ingress and egress for access purposes;

(c) Such easements will not require payments to
Lessee for their creation or use;

(d) Each such easement will be exercised in a manner
which does not unreasonably interfere with the rail operations
of Lessee except as provided in Subparagraph (b) of this
Article; and

(e) If any said easement is granted or reserved and
thereafter is not used within twenty (20) years of the date of
grant or reservation, said easement will be deemed abandoned.

23. Entire Agreement

Except as provided in Article 12(a) of this
Agreement, this Agreement constitutes the entire agreement

44

between Lessor and Lessee relating to Lessee's lease and operation, option to purchase, and purchase and operation of the White Oak Line, and no other representation, warranties, or agreements, either oral or written, will be binding upon Lessor or Lessee. This Agreement may be modified only by an instrument in writing signed by an authorized officer of Lessor and of Lessee.

## 24. Assignment, Sole Benefit

(a) This Agreement may be assigned by Lessee only with the written consent of Lessor, signed by an authorized officer, which consent will not be unreasonably withheld. To obtain Lessor's consent to such an assignment, Lessee will provide written notice to Lessor of its desire to assign this Agreement, including a letter signed by an authorized officer of the intended assignee stating that the assignee agrees to such assignment and agrees to be bound by all the terms of such assignment and the approvals and evidences required by Article 9 of this Agreement. This Agreement will be binding upon and inure to the benefit of successors and assigns of Lessor and successors and permitted assigns of Lessee; and

(b) This Agreement is intended for the sole benefit of the parties hereto, nothing in this Agreement is intended or may be construed to give any person, firm, corporation, or other entity, other than the parties hereto and their

45

respective officers, agents, employees, lessors, parent

corporation, subsidiaries, affiliates, successors, and assigns,

any right pursuant to any provision or term of this Agreement,

and all provisions and terms of this Agreement are and will be

for the sole and exclusive benefit of the parties to this

Agreement, except as provided in Paragraph (a) of this Article.

25. Notices

Except as provided in Article 12(b) and Article 13(d)

of this Agreement, All notices required by or given under this

Agreement will be sufficient in all respects if in writing and

delivered personally or by registered or certified mail,

postage prepaid, as follows:

To Lessor:

President
Central of Georgia Railroad Company
One Commercial Place
Norfolk, Virginia 23510-2191

To Lessee:

_____
_____
_____
_____

26. Arbitration

Any claim, dispute, or controversy between Lessor and

Lessee arising out of or relating to this Agreement or the

breach of this Agreement which cannot be settled by the parties

46

themselves will be determined by arbitration by a single arbitrator pursuant to the applicable Rules of Practice and Procedure of The Private Adjudication Center, Inc., an affiliate of Duke University School of Law (hereinafter the Center) in effect at the time the demand for arbitration is filed. The location of the arbitration will be the Center's facilities at Duke Law School, Durham, North Carolina. The decision of the arbitrator will be final and binding. Judgment to enforce the decision or award of the arbitrator may be entered in any court having jurisdiction, and the parties hereto agree not to object to the jurisdiction of the North Carolina General Court of Justice for such purpose. Service of process in connection with such arbitration will be made by certified mail. In any judicial proceeding to enforce this Article, the only issues to be determined will be the existence of an agreement to arbitrate and the failure of one party to comply with such agreement, and those issues will be determined summarily by the court without a jury. All other issues will be decided by the arbitrator, whose decision thereon will be final and binding. There will be no appeal of an order compelling arbitration except as part of an appeal concerning confirmation of the decision of the arbitrator. Each party to the arbitration will pay the compensation, costs, fees, and expenses of its own witnesses, exhibits, and counsel arising from the arbitration. The compensation, costs, and expenses of the arbitrator, if any, will be borne equally by Lessor and Lessee.

47

### 27. Nonwaiver

Any waiver at any time of a breach of any provision, condition, obligation, or requirement of this Agreement will extend only to the particular breach so waived and will not impair or affect the existence of any provision, condition, obligation, or requirement of this Agreement or the right of Lessor thereafter to avail itself of any breach, subject to such waiver.

### 28. Termination

(a) This Agreement may be terminated on or at any time prior to the Commencement Date upon mutual agreement of Lessor and Lessee. In event of such termination, Lessor promptly will refund to Lessee without interest the Option Fee, if already paid;

(b) This Agreement may be terminated at any time during the term of Lessee's lease of the White Oak Line by Lessee or upon mutual agreement of Lessor and Lessee. In event of such termination, Lessor promptly will refund to Lessee without interest the Option Fee, if already paid;

(c) This Agreement may be terminated by Lessee or by Lessor on or at any time prior to the Commencement Date if any substantive condition unacceptable to Lessee or to Lessor is

48

imposed upon the regulatory approvals or exemptions contemplated by Article 17 of this Agreement for Lessee's lease and operation of the White Oak Line and neither Lessee nor Lessor requests judicial review as contemplated by Article 17(b) of this Agreement. In the event of such termination, Lessor promptly will refund to Lessee without interest the Option Fee, if already paid;

(d) If any substantive condition unacceptable to Lessee or to Lessor is imposed upon the regulatory approvals or exemptions contemplated by Article 17 of this Agreement for Lessee's purchase and operation of the White Oak Line and neither Lessee nor Lessor requests judicial review as contemplated by Article 17(b) of this Agreement, Lessor promptly will refund to Lessee without interest the Option Fee and

(i) This Agreement may be terminated by Lessee or by Lessor on or at any time prior to the Closing Date;

(ii) Lessee's option to purchase the White Oak Line granted in Article 13 of this Agreement may be terminated by Lessee or by Lessor, but Lessee's lease of the White Oak Line pursuant to this Agreement will continue; or

(iii) Upon receipt by Lessee from the ICC or any other regulatory agency with jurisdiction any necessary certificate of public convenience and necessity or other

49

approvals or exemptions from regulation for discontinuance of Lessee's operations over the White Oak Line, Lessee may exercise the option to purchase the White Oak Line granted in Article 13 of this Agreement, discontinue its operations over the White Oak Line, and dispose of the White Oak Line as it chooses;

(e) This Agreement may be terminated by Lessor on or after March 31, 1989, if the regulatory approvals or exemptions for Lessee's lease and operation of the White Oak Line contemplated by Article 17 of this Agreement have not been obtained or are not effective. In the event of such termination, Lessor will refund to Lessee or pay without interest the Option Fee, if already paid;

(f) This Agreement may be terminated by Lessor if Lessee does not provide Lessor with satisfactory evidences of those corporate approvals required by Article 9 of this Agreement. In the event of such termination, Lessor will not refund to Lessee or pay interest on the Option Fee, if already paid;

(g) Lessor may terminate Lessee's lease of the White Oak Line, remove Lessee from the White Oak Line, retake possession of the White Oak Line and hold the same as if this Agreement had not been made, and Lessor will not refund to Lessee or pay interest on the Option Fee, if already paid

50

(i) If for a period of thirty (30) days, Lessee fails to keep or perform any one or more of Lessee's covenants or obligations under this Agreement and if such failure continues for a period of ten (10) days from the date of receipt of written notice from Lessor to Lessee of such failure; or

(ii) If the Annual Rental or any part thereof due under Article 2 of this Agreement remains unpaid for thirty (30) days after such Annual Rental becomes due, and Lessor will not be required to make a demand for such Annual Rental before making such termination;

(h) This Agreement may be terminated by Lessee on or after December 31, 1988, if Lessor has not obtained the appropriate corporate approvals required for Lessor to lease the White Oak Line to Lessee. In the event of such termination, Lessor promptly will refund to Lessee without interest the Option Fee, if already paid;

(i) This Agreement may be terminated by Lessee on or at any time prior to the Commencement Date if, subsequent to the date of this Agreement, the need for performance of rehabilitation or extraordinary maintenance causes Lessor or Lessee (as the case may be) to discontinue its operation of all or any part of the White Oak Line and if performance of rehabilitation or extraordinary maintenance is necessary to

51

permit Lessee to operate all or any part of the White Oak Line, provided, however, that lessee may not terminate pursuant to this clause if the cause of the need for such extraordinary maintenance or rehabilitation is attributable, directly or indirectly to the acts or inaction of lessee. In the event of such termination, Lessor promptly will refund to Lessee without interest the Option Fee, if already paid;

(j) If defects in Lessor's title to the White Oak Line are identified and are not corrected pursuant to Article 18 of this Agreement, Lessor promptly will refund to Lessee without interest the Option Fee and

(i) This Agreement may be terminated by Lessee on or prior to the Closing Date; or

(ii) Lessee's option to purchase the White Oak Line granted in Article 13 of this Agreement may be terminated by Lessee or by Lessor but Lessee's lease of the White Oak Line pursuant to this Agreement will continue;

(k) Upon expiration of Lessee's lease of the White Oak Line or if Lessee's lease of the White Oak Line is terminated pursuant to this Article,  except upon exercise by Lessee of its option to purchase the White Oak Line pursuant to Article 13 of this Agreement, Lessee will

52

(i) Upon request of Lessor, execute a release of Lessee's lease of the White Oak Line and of Lessee's option to purchase the White Oak Line in recordable form satisfactory to Lessor;

(ii) Forthwith vacate the White Oak Line;

(iii) Surrender the White Oak Line in good order to Lessor;

(iv) Restore the White Oak Line to its former condition, normal wear and tear excepted; provided, however, that during the term of Lessee's lease of the White Oak Line, Lessee may relocate switches and industrial tracks from one location on the White Oak Line to another location on the White Oak Line with any necessary and proper regulatory authority and after ten (10) days' written notice to Lessor; and

(v) Provided all sums due Lessor under this Agreement have been paid and all Lessee's obligations and covenants under this Agreement have been performed, remove from the White Oak Line any and all structures or other property belonging to Lessee or which Lessee caused or permitted to be placed or erected on the White Oak Line and which are the property of Lessee, except such removal by Lessee shall not include removal of any material placed in the White Oak Line as part of Lessee's ordinary maintenance obligation under this

53

Agreement. Such removal will be effected without damage to the property of Lessor. If Lessee fails to make such removal within thirty (30) days from the date of such termination, Lessor may take title thereto without consideration of any kind therefor or claim by Lessee or anyone claiming an interest by or through Lessee, or Lessor may remove all or any part of such structures and/or property and restore the White Oak Line to its former condition, except as stated in Subparagraph (iv) of this Paragraph, at the sole expense of Lessee, and Lessee will reimburse Lessor for such expense within thirty (30) days of receipt of a bill or bills therefor; and

(1) Lessee or Lessor may exercise its rights to terminate under this Article by giving to the other party to this Agreement thirty (30) days' written notice of such exercise.

## 29. Governing Law

This Agreement will be construed in accordance with the laws of the United States of America and the State of Georgia.

## 30. Counterparts

This Agreement may be executed in any number of counterparts, each of which may be deemed an original for any purpose.

54

31. <u>Captions</u>

The captions of the articles herein are inserted for convenience only and shall in no way expand, restrict or modify the terms and provisions of any clause hereof.

IN WITNESS WHEREOF the parties hereto duly executed this Agreement as of the day and year first above written.

In the presence of:          CENTRAL OF GEORGIA RAILROAD COMPANY

As to Central of            By _____
 Georgia Railroad Company        Vice President

                            Attest:

                            _____
                            Assistant Secretary

In the presence of:          THE SOUTH WESTERN RAIL ROAD COMPANY

As to The South Western     By _____
 Rail Road Company               Vice President
                            Attest: _____
                                      Secretary

In the presence of:          South Carolina Central Railroad Co., Inc.

As to Lessee                By _____
                                 Vice President

                            Attest:

                            _____
                            Secretary

55

## EXHIBIT A

Smithville, GA to White Oak, AL

Calculation of Lease Credits
pursuant to Article 2 of the Agreement

| Annual Car Credits | Lease Credits |
|---|---|
| First Year | |
| Zero to 1,785 Car Credits | No Lease Credits |
| 1,786 Car Credits or More | $244 Per Car Credit |
| Second Year | |
| Zero to 1,821 Car Credits | No Lease Credits |
| 1,822 Car Credits or More | $244 per Car Credit |
| Third Year and Thereafter | |
| Zero to 1,858 Car Credits | No Lease Credits |
| 1,859 Car Credits or More | $244 per Car Credit |

56

EXHIBIT B

Smithville, GA to White Oak, AL

Excepted Rights and Properties
Under Article 13(b)

Property outlined in red on attached maps marked Attachment A
(4 pages)