

**LUFKIN CREOSOTING COMPANY, INC.**
P.O. BOX 1207 • Phones: OFFICE (936) 634-4923 • PLANT (936) 634-4552
FAX: (936) 634-2100
LUFKIN, TEXAS 75902-1207

Please Remit To:
P.O. Box 4424
Department 01
Houston, TX 77210



000000078990

**INVOICE NUMBER**
43672

BILL TO: Georgia Southwestern Railroad, Inc.
Attn: Accounts Payable
78 Pulpwood Road
DAWSON, GA 39842

SHIP TO: GSWR % Lindsey Construction
Job Site
333 Broad Street
Eufaula, AL

| DATE | ORDER | SALESMAN | ORDER DATE | PURCHASE ORDER | SPECIAL INSTRUCTIONS |
|---|---|---|---|---|---|
| 10/03/05 | 23568 | HOU | 09/02/05 | 511861 | 732805, 732818 |

| QUANTITY | U/M | DESCRIPTION | CODE | PRICE | EXTENSION |
|---|---|---|---|---|---|
| 41 | | Lumber Creosote 9x10  10 Ft. | 40910 | 101.25 | 4,151.25 |
| 25 | | Lumber Creosote 8x16  26 Ft. | 40816 | 514.13 | 12,853.25 |
| 45 | | Lumber Creosote 3"x10"X 20 Ft. | 40310 | 67.50 | 3,037.50 |
| 29 | | Lumber Creosote 5"x8"X 18 Ft. | 40508 | 72.00 | 2,088.00 |
| 10 | | Lumber Creosote 6"x14"x 26 Ft. | 40614 | 336.70 | 3,367.00 |
| 2 | | Freight Charges | 55550 | 1,324.00 | 2,648.00 |

Treated with No. 1 Creosote, Thanks for your Business

PAYMENT / TERMS
Net 30

SUBTOTAL : 28,145.00
TAX : .00

EXHIBIT 3

**Georgia Southwestern Railroad, Inc.**

| | | | | | | 1/20/2006 | | 9642 |
|---|---|---|---|---|---|---|---|---|
Lufkin Creosoting Company, Inc.

| Date | Type | Reference | | Original Amt. | Balance Due | Discount | Payment |
|---|---|---|---|---|---|---|---|
| 10/03/2005 | Bill | Inv #43672 | | 28,145.00 | 28,145.00 | | 28,145.00 |
| | | | | | Check Amount | | 28,145.00 |



First National Bank of So    Inv #43672                                          28,145.00

515010 (12/04)

Lindsey Contractors, Inc.
4660 M. J. Taylor Road
Adel, Ga. 31620

# Invoice

| DATE | INVOICE # |
|---|---|
| 2/13/2006 | 4638 |

**BILL TO**
Georgia Southwestern Railroad, Inc.
C/O Terry Small
78 Pulpwood Road
Dawson, GA   39842

**NATURE OF SERVICES**
January 2006
Repairs on trestle @ MP 338.8
White Oak

| SERVICE CONT... | VENDOR | LOCATION |
|---|---|---|
| SC0554 | 00777A0 | MP 338.8 |

| DESCRIPTION | HRS | RATE | AMOUNT |
|---|---|---|---|
| Remove structure damage by fire; ties, guard rail, stringers and hardware | | 3,500.00 | 3,500.00 |
| Install ties | | 4,000.00 | 4,000.00 |
| Install guard rail | | 3,420.00 | 3,420.00 |
| Install stringers | | 27,000.00 | 27,000.00 |
| Replace bracing | | 12,000.00 | 12,000.00 |
| Replace post | | 5,400.00 | 5,400.00 |
| Hardware (brace bolts and stringer core bolts) | | 3,000.00 | 3,000.00 |

| Phone # | Fax # |
|---|---|
| 229-794-3762 | 229-794-9308 |

**Total**  $58,320.00

**GEORGIA SOUTHWESTERN RAILROAD, INC.**

Lindsey Contractors, Inc.                Invoice # 4638  Repairs on trestle MP 338.8                7/20/2006                **1624**
                                                                                                                              58,320.00

                                                                                                                              58,320.00

Wachovia Checking

LMP12    M/P CHECK

51N315 (10/05) 526882

# DEPOSITION OF AMERICUS MITCHELL

## September 22, 2006

## Pages 1 through 59

### CONDENSED TRANSCRIPT AND CONCORDANCE
### PREPARED BY:

Haislip, Ragan, Green, Starkie & Watson, P.C.
566 South Perry Street
Post Office Box 62
Montgomery, AL 36104
Phone: (334) 263-4455
Fax: (334) 263-9167
E-mail: haislipragan@charter.net

Page 17

1  10-foot harrow that I own, and it's just a
2  matter of harrowing the fire breaks.
3  Q. You mentioned that your fire breaks can be
4  natural fire breaks, roadbeds or prepared fire
5  breaks that you're talking about that you go
6  through with your harrow.
7  A. Yes.
8  Q. How many natural fire breaks were there on
9  this particular tract?
10 A. It was natural fire breaks on the north and
11 the east and the south and part of the west.
12 Q. So this tract was nearly surrounded by natural
13 fire breaks then?
14 A. Yes.
15 Q. Can you explain to me exactly what those
16 natural fire breaks were?
17 A. Natural fire breaks was a road on the north.
18 Q. Let me ask you specifically about that road.
19 Is that a county-maintained road or is it just
20 one of your internal roads?
21 A. It was at one time a county-maintained road.
22 And it was since abandoned, and I maintain it
23 now, what part of it that's left that's in my

Page 18

1  property.
2  Q. And that was the north side?
3  A. Yes.
4  Q. What about the east and the west?
5  A. The east side is a natural stream, 6 or 8
6  foot, unless it's in flood level, which would
7  be 20 feet, you know, and then a tributary to
8  Lake Eufaula on the south and a partial stream
9  on the west and my harrowed fire break to
10 balance on the rest.
11 Q. Which side does the railroad border on this
12 particular tract?
13 A. The railroad runs east and west across the
14 southern portion of this particular tract.
15 Q. And a portion of that you mention on the
16 southern portion is a stream that you're using
17 as a natural fire break; is that correct?
18 A. Yes.
19 Q. Did you maintain fire breaks adjacent to the
20 railroad?
21 A. No.
22 Q. Did you use the railroad as a fire break, the
23 rocks and things along the railroad?

Page 19

1  A. In years past there was no need to worry about
2  the railroad because it was maintained. The
3  railroad is sufficiently dressed with crushed
4  rock, and it actually could be used as a fire
5  break itself, the railroad. But, of course,
6  the railroad went through it so we burned on
7  both sides of the railroad.
8  Q. But my question to you is, did you maintain
9  fire breaks adjacent to the railroad or did
10 you just use the gravel on the railroad as a
11 natural fire break?
12 A. I did not have any fire breaks on the
13 railroad.
14 Q. I want to ask you about your -- When I asked
15 y'all for some discovery request, Craig gave
16 me a copy of the burn permit that you
17 obtained. Who did you have to obtain the burn
18 permit from?
19 A. They have an 800 number that you call, and
20 I've got it somewhere in my records.
21         (Plaintiff's Exhibit 1 marked for
22         identification.)
23 Q. Mr. Mitchell, I'm going to show you a copy of

Page 20

1  this document here. Since you stated that you
2  called, I'm not sure if you've ever seen it
3  before.
4         MR. ALLRED: I'm sorry to interrupt
5         you, but that was generated off
6         of a state database at the
7         Forestry Commission and that's
8         how I got that document. He
9         never was provided with a written
10        copy of the permit in this
11        instance.
12        MR. JOHNSON: That's fine. I just
13        wanted to get Mr. Mitchell to
14        take a look at it.
15 Q. Mr. Mitchell, you stated earlier you've been
16 conducting prescribed burns on your property
17 for several years; is that correct?
18 A. Yes.
19 Q. And every time you conduct a prescribed burn,
20 is it your practice to obtain a burn permit?
21 A. Yes. You have to.
22 Q. And that's pursuant to the Alabama Forestry
23 Commission's regulations?

Page 21

1  A. Yes.
2  Q. And to your knowledge -- I understand your
3     attorney has just informed me that this was a
4     computer printout, but to your knowledge was
5     this the burn permit or a computer printout of
6     the burn permit you obtained prior to this
7     burn in February of 2005?
8  A. As far as I can concern (sic), but it's got
9     acres, one, and that's in error.
10 Q. But the date here is -- date of burn is
11    February 12, 2005, and that would be correct?
12 A. As far as I know, that's correct.
13 Q. Yes, sir.
14    Did you contact the Forestry Commission
15    yourself to obtain the burn permit?
16 A. Yes.
17 Q. And you obtained that through the local
18    division here in Barbour County --
19 A. No.
20 Q. -- or is it through the state?
21 A. No. Called them up long distance. They've
22    got an 800 number.
23 Q. So you called somebody in Montgomery or --

Page 22

1  A. I thought they used to answer in Troy, but I
2     think they answer now in Montgomery. Wherever
3     that 800 number takes me, that's who I talked
4     with.
5  Q. And so long as there's not -- the fire
6     marshal hasn't said there's a burn alert or
7     anything like that, there's usually not any
8     problem obtaining a burn permit, is there, for
9     you?
10 A. No problem.
11 Q. What type of information did you give them
12    when you requested the burn permit?
13 A. I gave them the approximate acreage, but it
14    was more than one.
15 Q. When you did that, did you give them any
16    additional information?
17 A. I gave them whatever they asked for.
18 Q. Let me ask you a couple of questions about
19    things they may have asked for when you were
20    obtaining the burn permit.
21    Did they ask you about the manpower or
22    equipment you were going to use in conducting
23    the prescribed burn?

Page 23

1  A. No.
2  Q. Did they ask you about the firing technique
3     that you were going to use in conducting the
4     prescribed burn?
5  A. They asked me what the purpose of the burn was
6     for, and I told them fuel reduction.
7  Q. Did you have to inform them or did they ask
8     you about any other areas adjacent to the area
9     that you were going to be involved in the
10    prescribed burn that could be adversely
11    impacted by smoke or by fire?
12 A. No.
13 Q. Did they ask you about any other special
14    precautions that were going to be taken?
15 A. On occasion they ask me if it's next to a road
16    where smoke might interfere. And, of course,
17    this is on the back side of the place, and we
18    don't have any that would affect the road --
19    any land that would affect the road.
20 Q. You mentioned that you have a registered
21    forester that came down and laid out your fire
22    breaks for you.
23 A. Yes.

Page 24

1  Q. Did Mr. Moore formulate a prescribed burn plan
2     for you?
3  A. Well, he leaves that judgment up to me. I can
4     tell when the fuel begins to burn up. We
5     generally try to burn every two to three
6     years, and sometimes we don't get around to
7     doing that. But in this particular area, it
8     just happened on that -- that was ready for a
9     burn. And I applied for a permit and got a
10    permit and burned it.
11 Q. But my question was, Mr. Moore didn't give you
12    a written prescribed burn plan before you did
13    this particular controlled burn?
14 A. No.
15 Q. Has Mr. Moore ever given you a written
16    prescribed burn plan that he signed and was
17    notarized?
18 A. No.
19 Q. Mr. Mitchell, you've been doing your
20    prescribed burns on your place for several
21    years as we've mentioned. Have you ever had
22    anybody that had a prescribed burn
23    certification present while you were doing

Page 25

1    your prescribed burns? Let me back up.
2         Have you ever heard the term "prescribed
3    burn certification"?
4    A. No.
5    Q. Are you aware that the State of Alabama and
6    the Forestry Commission requires somebody with
7    a prescribed burn certification be present
8    when prescribed burns are being conducted?
9    A. I was not aware of it. We never have used it.
10   Q. Yes, sir.
11        Have you or anybody -- say, any of your
12   grandsons or your sons, anybody that's ever
13   been helping you out here, ever gone through
14   any training to your knowledge to become
15   prescribed burn certified?
16   A. Any formal training? When it comes to
17   prescribed burns, your best ally you have is
18   experience in doing it before. And most of my
19   sons and grandsons have all helped me in the
20   past in my prescribed burns.
21   Q. How long before you did this prescribed burn
22   in February did you take your tractor over
23   there and your harrow and prepare your fire

Page 26

1    breaks?
2    A. Oh, within the last -- within -- I would say
3    we watch the weather. And if you get the
4    lanes plowed within a matter of a week, that's
5    what we try to do. And that's what I did on
6    this particular burn.
7    Q. What do you look for weather-wise when you're
8    thinking about doing a prescribed burn? What
9    type of conditions do you look for?
10   A. Well, the first thing you want to look for is
11   is it dry enough to burn. And if it's dry
12   enough to burn, you have to see about the
13   wind. And then you have to see about help,
14   and then you have to make sure that you do it
15   early in the morning while dew is on the
16   ground to get it started. And you burn the --
17   light on the perimeters and burn to the center
18   of the area. And you try to do that as early
19   in the morning as you can, preferably nine or
20   ten o'clock in the morning.
21   Q. You mentioned that you look for the right
22   amount of moisture. You want to make sure
23   it's dry enough to burn. In your opinion, was

Page 27

1    it dry enough to burn in February when you
2    conducted the prescribed burn?
3    A. Yes.
4    Q. Had you had an adequate amount of rainfall
5    during the month of January and February so it
6    wasn't overly dry?
7    A. That's right.
8    Q. And do you recall -- Let me say this. What
9    type of wind conditions are optimal for
10   conducting a prescribed burn?
11   A. Preferably something less than 10 miles an
12   hour.
13   Q. Do you recall what the approximate wind speeds
14   were for that time --
15   A. I have no idea.
16   Q. Do you recall specifically what the wind
17   speeds were like that day?
18   A. It was calm.
19   Q. Do you remember there being any gusts of wind
20   or anything like that during the day or was it
21   calm throughout the day as far as you can
22   recall?
23   A. It was a calm day as far as -- that I could

Page 28

1    recall.
2    Q. I'm going to ask you to take a look at these
3    two printouts here. These are from the
4    National Weather Service.
5         MR. JOHNSON: I'm going to mark them
6             collectively as Plaintiff's
7             Exhibit 2.
8         (Plaintiff's Exhibit 2 marked for
9             identification.)
10   Q. Unfortunately the National Weather Service
11   must not think very highly of Eufaula because
12   they don't have a weather station in Eufaula.
13   The closest ones that they had were Troy and
14   Montgomery. I suppose I probably could have
15   looked at Columbus, Georgia, but I figured
16   Troy was about as close as Columbus, Georgia.
17        I'm going to ask you --
18   A. Now, how in the name of Pete can you determine
19   what the wind is doing in Eufaula from
20   Columbus, Georgia?
21   Q. I don't know. But we can kind of work on some
22   averages, I think.
23        I'm going to get you to take a look at

Page 37

1  Q. I'm going to show you what I'm going to mark
2     for identification as Plaintiff's Exhibit 3.
3     This is the fire incident report from the
4     Eufaula Fire Department.
5        Have you ever seen these documents before?
6  A. No, I never have.
7     What do you want me to do with them?
8  Q. I just wanted to ask you to look at them, and
9     I'm going to ask you a couple of questions.
10       The dates and times that are referenced
11    indicates that the alarm was taken at 7:33 on
12    the 13th of February -- see the dates here? --
13    and that they arrived about five minutes
14    after. That's pretty good response time for
15    getting them down in the woods, I think.
16 A. They came out there the day of the burn. If
17    the burn was on the 12th, they were out there
18    that afternoon. That might have been about
19    the right time.
20 Q. Now --
21 A. But they stayed there all night.
22 Q. Did they get there in the afternoon?
23 A. Yeah.

Page 38

1  Q. Was it still daylight when the fire department
2     got there?
3  A. Yeah. Yeah. They got there late that
4     afternoon.
5     MR. ALLRED: If I could interject
6        for just a minute here, I have a
7        copy of a report here on the 12th
8        if you want to take a look at
9        that.
10    MR. JOHNSON: Did you produce this
11       in your discovery?
12    MR. ALLRED: I don't know. I
13       thought I did.
14    MR. JOHNSON: I know you didn't
15       because this is the first one
16       I've seen. This is the only fire
17       department report that we've
18       seen.
19    MR. ALLRED: Well, apparently I
20       didn't give you the 12th.
21    MR. JOHNSON: If you can send me a
22       copy of it, that will be fine.
23    MR. ALLRED: Sure.

Page 39

1        You know, I'm not sure that
2        wasn't produced to me by you
3        initially.
4     MR. JOHNSON: I don't think so
5        because I don't think we've got a
6        copy of this one. I think this
7        is the only fire department
8        report we have.
9        Off the record.
10       (Brief off-the-record discussion.)
11 Q. Mr. Mitchell, Craig has just shown me that
12    there was a separate incident report filed for
13    the 12th so I've been asking you about the
14    dates. The fire department did arrive on the
15    12th apparently?
16 A. Uh-huh (positive response).
17 Q. And this report I marked for Number 3 would be
18    when they came back out the next morning?
19 A. Yes.
20 Q. Were you out there the next morning when the
21    fire department arrived?
22 A. I was not.
23 Q. It says that Ben Mitchell was there according

Page 40

1     to this. Is that your son?
2  A. That's my son.
3  Q. When y'all were out there on that afternoon,
4     do you recall if you or if anybody from the
5     fire department notified anybody from Georgia
6     Southwest Railroad?
7  A. Yes. They told me later on that they had
8     called the railroad.
9  Q. Before you conducted the prescribed burn, did
10    you ever contact anybody from the railroad to
11    tell them you were going to be conducting a
12    prescribed burn?
13 A. No. I never have.
14 Q. You've never contacted the railroad to notify
15    them that you were conducting a prescribed
16    burn?
17 A. Huh-uh (negative response).
18 Q. Do you own the railroad itself or does the
19    railroad own that property?
20 A. I don't own any railroad.
21 Q. That's my question to you. The land that it
22    sits on, that little right-of-way there --
23 A. The right-of-way belongs -- it originally

Page 45

1    adjacent to the railroad and adjacent to that
2    trestle, do you think the railroad still would
3    have caught fire?
4  A. Probably not.
5  Q. Do you know what that particular spur line
6    services? Was there a old business -- an old
7    industry or something on the end of that spur
8    line?
9  A. It was serving the Georgia Pacific Company,
10   and how often I have no record of it. I
11   couldn't attest to that.
12 Q. But that business at this time, it was no
13   longer in operation?
14 A. No longer in operation.
15 Q. To your knowledge was the railroad still using
16   the line to run freight cars up and down to
17   service that business?
18 A. No.
19 Q. To your knowledge was the railroad still using
20   the line for other purposes?
21 A. At one time they had, I would say, in excess
22   of a hundred cars stored on that track.
23 Q. Were they stored on both sides of this

Page 46

1    particular trestle that we're talking about
2    here?
3  A. Yes.
4  Q. So there were cars on the other side of the
5    trestle on the same side as the old industry
6    down there?
7  A. Yes.
8  Q. How far is it to your knowledge or, if you
9    know, from that trestle down there to where
10   that old business is?
11 A. Come again with that question.
12 Q. Do you know how far it is, say even from your
13   property down there, how long that line is to
14   where it gets to the end of that spur line
15   where that business is down there?
16 A. Oh, from my property to the business?
17 Q. Yes, sir.
18 A. The business is in the outskirts of Clayton.
19   I would say it would be at least 10 to 12
20   miles down there to the business.
21 Q. And you believe that prior to the fire they
22   were storing cars on the length of that line?
23 A. They were storing cars on that line for

Page 47

1    several weeks I know.
2  Q. Did you ever contact the folks at Georgia
3    Southwestern Railroad about asking them to
4    move some of the cars so y'all could get
5    across the railroad?
6  A. I did.
7  Q. Do you recall when that may have been?
8  A. No, I can't recall. But the cars that were
9    stored blocked roads to property that we
10   owned, and we couldn't get down to it.
11 Q. Did the folks from the railroad come down and
12   move the cars when you called them to open
13   your road up?
14 A. I called them and told them they had it
15   blocked, and they opened gaps in the road
16   where you could go in through it.
17 Q. Yes, sir.
18   After the fire and after the trestle was
19   damaged, was the railroad still able to cross
20   that bridge and put cars on the other side of
21   that bridge?
22 A. I don't know. Not to my knowledge.
23 Q. Do you know if the bridge has been repaired

Page 48

1    since that time, if there's been any repairs
2    undertaken on that particular bridge?
3  A. There's been repairs undertaken. But as far
4    as I know, it never has been completed.
5       (Brief recess.)
6  Q. (Continuing by Mr. Johnson) Mr. Mitchell, I've
7    got a few more questions I want to ask you.
8    Your counsel produced copies of some
9    photographs here. I'm going to get you to
10   take a look at these pictures and ask you a
11   couple of questions about them.
12      (Plaintiff's Exhibit 4 marked for
13      identification.)
14 Q. I'm going to mark these collectively as
15   Plaintiff's Exhibit 4. There's a bunch of
16   pictures in here.
17   Do you know when those were taken?
18 A. They were taken, oh, I would say, several
19   weeks after the fire.
20 Q. So you think they were taken at some point
21   during maybe the latter part of February or
22   first part of March?
23 A. Yes, I would say so.

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

GEORGIA SOUTHWESTERN RAILROAD, )
INC., a Corporation,            )
                                )
         Plaintiff,             )
                                )  CIVIL ACTION FILE
    vs.                         )
                                )  NO. 2:06CV3-B
AMERICUS C. MITCHELL, JR.,      )
                                )
         Defendant.             )

Deposition of DAVID L. SMOOT, taken by counsel for Defendant, pursuant to agreement, under the Federal Rules of Civil Procedure, and reported by Grace F. Lengmueller, RPR, held in the offices of Georgia Southwestern Railroad, Inc., 78 Pulpwood Road, Dawson, Georgia, on August 25th, 2006, commencing at 12:05 p.m.

ACCREDITED COURT REPORTERS
Post Office Box 1701
Columbus, Georgia 31902
(706) 323-3640
(800) 662-2741

---

APPEARANCES OF COUNSEL:

FOR THE PLAINTIFF:

ADRIAN D. JOHNSON
Attorney at Law
Parnell & Crum, P.A.
641 South Lawrence Street
Post Office Box 2189
Montgomery, Alabama 36102
(334) 832-4200

FOR THE DEFENDANT:

D. CRAIG ALLRED
Attorney at Law
David E. Allred, P.C.
7030 Fain Park Drive
Suite 9
Post Office Box 241594
Montgomery, Alabama 36124
(334) 396-9200

- - -

I N D E X

PAGE

OPENING REMARKS AND STIPULATIONS ---------------- 3

EXAMINATION:
    By Mr. Allred --------------------------- 3

CERTIFICATE ------------------------------------- 10

---

DAVID L. SMOOT,
having been produced and first duly sworn
as a witness, testified as follows:
EXAMINATION
BY MR. ALLRED:

Q    Could you state your name for us, please, sir.

A    David L. Smoot.

Q    And you are part owner of the Georgia Southwest Railroad; is that correct?

A    That's correct.

Q    And what percentage shareholder are you?

A    49 percent.

Q    49? Okay. And how long have you been with the company?

A    Since its charter, which was -- or since we purchased it in 2002.

Q    Okay. And what is your position with the company?

A    Corporately, I'm the secretary/treasurer, and I'm also vice president.

Q    Okay. And what are your duties with the company?

A    My primary responsibility is I handle all of our real estate matters; I handle contracts with our

---

various customers; I handle the tax records and things of that nature, the guardian of personnel records; and then I also do the freight accounting, oversee the freight accounting.

Q    Okay. So you'd be in charge of securing right-of-ways and easements for the use of the railroad company?

A    We general -- if we were going to do something like that, I would work with an attorney to do it, but generally, my main function is when people come to us and want an easement --

Q    Sure.

A    -- or our right-of-way.

Q    Okay. I discussed this earlier with Mr. Small a little bit, and I'll -- I was wondering if you could give me some more details on it. He told me that there's a contract between you, this company, and Rail-Tex for the use of the railway where the White Oak Spur is. Could you tell me a little bit about that lease, the lease contract that you have for the use of the White Oak Spur.

A    I'm -- there's no contract between us and Rail-Tex.

Q    Okay. Who is the contract between?

A    It would be us and Norfolk Southern

```
 1  Corporation.
 2      Q    Okay.  And what are the terms of that
 3  contract?
 4      A    Well, that's -- it's a pretty thick document.
 5  Basically, the terms are that we provide the switching
 6  service on the line segment, and they can adopt the
 7  stations as if they were their own for rate-making
 8  purposes.  And we will handle all of the switching for
 9  the local customers and then take the cars back to the
10  railroad interchange to either Norfolk Southern or to
11  CSX Transportation.
12      Q    Okay.  And under the terms of that contract,
13  who's responsible for the maintenance of the --
14      A    Georgia Southwestern Railroad would be
15  responsible for the maintenance.
16      Q    Okay.  And what's the -- what are the time --
17  terms as far as the time on the lease?
18      A    The initial lease was a 20-year document.
19      Q    Okay.
20      A    With certain renewal provisions.  I don't
21  recall those.
22      Q    Okay.  Do you know when it was signed
23  originally?
24      A    No.  I don't know the original date.
25      Q    Okay.  Do you know about how much longer you
```
                                    5

```
 1  repairs have been begun?
 2      A    No, I have not.
 3      Q    Okay.  And do you know if they've been
 4  completed?
 5      A    Well, I don't have personal knowledge that
 6  they were completed, but the contractor billed us.
 7      Q    And what are the costs of the invoices that
 8  have been sent to you so far?
 9      A    I don't have them memorized.
10      Q    Okay.  Is there any way you could get that
11  information to us?  Let us know what you've paid?
12      A    Yeah.  I'm sure that we can.
13      Q    Okay.  Do you have any estimation as what the
14  value was of the trestle before the fire?
15      A    I don't.  I personally do not know that
16  value, no.
17      Q    Okay.  So you'd have to speculate to put a
18  value --
19      A    Yeah.  I'd have to find an expert that would
20  tell me what that trestle would be worth.
21      Q    Okay.  And it was my understanding from
22  Mr. Small and Mr. Eggers that the repairs on the
23  trestle began in fall of '05.  Does that sound about
24  right to you?
25      A    Well, I don't know.  I don't recall the exact
```
                                    7

```
 1  have?
 2      A    Since that time, we've exercised an option to
 3  purchase that line segment from the Norfolk Southern
 4  Corporation.
 5      Q    Okay.  Have you already purchased that line?
 6      A    No.  It's an ongoing -- it's in process right
 7  now.
 8      Q    Okay.  So will that be completed in the next
 9  year?  Two years?
10      A    We believe it will be completed in the next
11  few months.
12      Q    Okay.  As far as the trestle goes, the
13  trestle that we're here on today, are you familiar with
14  the repairs that have been done on the trestle?
15      A    I'm familiar enough to say that the repairs
16  were done to the trestle.
17      Q    Okay.  To your understanding, what's been
18  done to the trestle?
19      A    Just in general, I -- there was an invoice
20  that was generated from our contractor, and I believe I
21  had sent that on to Mr. Mitchell.
22      Q    Uh-huh.  You did.
23      A    I didn't go into the detail about what they
24  did.
25      Q    Okay.  And have you been there since the
```
                                    6

```
 1  dates.  I mean, if they both testified that way, I'm
 2  sure that was --
 3      Q    Okay.  Well, if they did begin in the fall of
 4  '05, can you think of any reason why they should not
 5  have begun closer in proximity to the time of the fire?
 6      A    No.  I don't -- I mean, my understanding was
 7  that the repairs that were made were because of the
 8  fire, so I don't believe it was repairs scheduled to be
 9  made prior to that.
10      Q    No.  I mean, between the time of the fire in
11  the fall of '05, is there any reason that you know of
12  that the repairs weren't begun, say, in March of '05?
13      A    No.  Only with the schedule of our
14  contractor.
15      Q    Okay.  Since the Louisiana Pacific Company
16  ceased its operations, what -- to what extent has the
17  track been used, that you know of?  The White Oak Spur.
18      A    There was a couple of movements of machinery
19  out of the plant that were sold that came off of there,
20  and then beyond that, we have had some railcars pushed
21  out there onto that track segment being held.
22      Q    Okay.  So basically, the -- moving that
23  equipment and the storage of railcars is the only thing
24  it's been used for?
25      A    To my knowledge, that's all we used it for.
```
                                    8

---

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

GEORGIA SOUTHWESTERN RAILROAD, )
INC., a Corporation,           )
                               )
        Plaintiff,             )
                               )  CIVIL ACTION FILE
vs.                            )
                               )  NO. 2:06CV3-B
AMERICUS C. MITCHELL, JR.,     )
                               )
        Defendant.             )

        Deposition of **TERRY R. SMALL**, taken by counsel for Defendant, pursuant to agreement, under the Federal Rules of Civil Procedure, and reported by Grace F. Lengmueller, RPR, held in the offices of Georgia Southwestern Railroad, Inc., 78 Pulpwood Road, Dawson, Georgia, on August 25th, 2006, commencing at 9:16 a.m.

ACCREDITED COURT REPORTERS
Post Office Box 1701
Columbus, Georgia 31902
(706) 323-3640
(800) 662-2741

---

APPEARANCES OF COUNSEL:

FOR THE PLAINTIFF:

    ADRIAN D. JOHNSON
    Attorney at Law
    Parnell & Crum, P.A.
    641 South Lawrence Street
    Post Office Box 2189
    Montgomery, Alabama  36102
    (334) 832-4200

FOR THE DEFENDANT:

    D. CRAIG ALLRED
    Attorney at Law
    David E. Allred, P.C.
    7030 Fain Park Drive
    Suite 9
    Post Office Box 241594
    Montgomery, Alabama  36124
    (334) 396-9200

ALSO PRESENT:  Terry B. Eggers
               Jason S. Revalee

                I N D E X
                                                PAGE
OPENING REMARKS AND STIPULATIONS -----------------  3

EXAMINATION:
        By Mr. Allred ----------------------------  3
        By Mr. Johnson --------------------------- 49

CERTIFICATE ------------------------------------- 59

EXHIBITS:
        Defendant's Exhibit Number 1 ------------ 34
        Plaintiff's Exhibit Number 1 ------------ 49
        Plaintiff's Exhibit Number 2 ------------ 49
        Plaintiff's Exhibit Number 3 ------------ 52
        Plaintiff's Exhibit Number 4 ------------ 52

---

1   MR. ALLRED:  We're going to have
2   the usual stipulations with -- he and I
3   have agreed that this will be admissible
4   in an Alabama court since you're a
5   Georgia court reporter, and we've
6   already agreed to that prior to the
7   deposition.
8              TERRY R. SMALL,
9   having been produced and first duly sworn
10      as a witness, testified as follows:
11             EXAMINATION
12  BY MR. ALLRED:
13      Q    Mr. Small, I'm Craig Allred here for Americus
14  Mitchell, the defendant in this case.  I'm just going
15  to ask you a few questions here.  If at any time you --
16  if I'm not clear on the question or you don't
17  understand the question, just let me know; I'll be glad
18  to repeat it for you.  Or if you'd like to talk to
19  Adrian at any time, just let me know, and we can pause
20  for a minute, and y'all can go out in the hall.
21           Would you please state your name for us one
22  more time.
23      A    Terry Ray Small.
24      Q    Okay.  And you're an employee of the Georgia
25  Southwest Railroad?

---

1       A    Yes.
2       Q    Do you own the company?
3       A    Majority, yes.
4       Q    Okay.  What's the general corporate structure
5   of the company?
6       A    It's privately held; myself and one other
7   shareholder.
8       Q    Okay.  And who's that other shareholder?
9       A    David L. Smoot.
10      Q    Okay.  And if you would, tell me a little bit
11  about what type of railroad this is.
12      A    This is a short-line railroad that
13  basically -- we operate from Greenville, Georgia, to
14  Bainbridge, Georgia; Smithville to White Oak, Alabama,
15  into Eufaula.
16      Q    Okay.  So just in the states of Georgia and
17  Alabama?
18      A    Yes.
19      Q    Okay.  And it's a Georgia corporation; is
20  that --
21      A    No.  Delaware --
22      Q    A Delaware --
23      A    -- corporation.
24      Q    -- corporation?
25      A    Yes.  Yes.

**Page 5**

```
 1      Q    Okay. What -- what types of freight do you
 2  haul?
 3      A    Of course, a wide variety, but the majority
 4  being peanut and peanut by-products, clay pellets and
 5  aggregate, and then -- a lot of other stuff, smaller
 6  volume, and hazardous materials, plastics, wood, ag
 7  products; you know, grain, corn, wheat.
 8      Q    Okay. What would you consider to be the
 9  railroad's primary market? Like what -- who do you try
10  to get business from?
11      A    It's more a regional thing. Wherever your
12  footprint is you try to get business from anybody
13  that's going to have a bulk commodity that will ship.
14      Q    Okay.
15      A    So it's not a commodity group as much as a
16  territorial thing. Railroads, you're limited to
17  operating on your footprint, so anyone that would ship
18  or receive a bulk commodity within our footprint.
19      Q    Okay. Who are some of your representative
20  clients?
21      A    Are you asking who our customers are?
22      Q    Yes.
23      A    Golden Peanut would be one of the larger
24  ones.
25      Q    Are they here in Georgia?
```

**Page 6**

```
 1      A    Yes.
 2      Q    Okay.
 3      A    And Alabama. Carbo (phonetic) Ceramics in
 4  Eufaula to Cinderlo Curly (phonetic); they're bulk in
 5  materials that are primarily -- I mean, they're on the
 6  Georgia side, but -- and then we get into, you know, a
 7  lot smaller ones.
 8      Q    Okay. And is this a Class I railroad?
 9      A    No.
10      Q    What classification --
11      A    Class III.
12      Q    Class III? Okay. And generally, what does
13  that mean?
14      A    That we have less than $22 million of gross
15  revenue annually.
16      Q    Okay. And just a few general questions about
17  who's going to be the most knowledgeable about what
18  areas. And Adrian's already given me some information
19  on this, but who would know the most about the use of
20  the track prior to the incident that we're here on
21  today?
22      A    As far as use, it -- really, any -- myself,
23  Dave, or Jason.
24      Q    Okay.
25      A    And Terry would know what usage had been out
```

**Page 7**

```
 1  there.
 2      Q    Okay. How about the maintenance of the track
 3  from the time that it was built until now?
 4      A    The -- well, from the time it was built, you
 5  know, we could not speak on that.
 6      Q    Okay.
 7      A    But in terms of, you know, the last, you
 8  know, five or six years, then, of course --
 9      Q    Okay.
10      A    -- within that.
11      Q    Let me ask you: How long has Georgia
12  Southwest Railroad owned that particular track?
13      A    Well, technically, Georgia Southwestern does
14  not own that piece of track.
15      Q    Okay. Who owns it?
16      A    The Georgia Southwest Corporation, who then,
17  in turn, leases it to the Norfolk Southern.
18      Q    Okay.
19      A    Who then, in turn, leases it to the Georgia
20  Southwestern Railroad, who then we have the maintenance
21  responsibility.
22      Q    Okay. So explain that to me one more time.
23           Who actually owns it?
24      A    Georgia Southwest Corporation.
25      Q    Okay. Who are they? Are they affiliated
```

**Page 8**

```
 1  with y'all?
 2      A    No. And they're one of the -- they're one of
 3  the companies involved with Norfolk Southern.
 4      Q    Okay. So that's a --
 5      A    For practical purposes, Norfolk Southern
 6  Companies own it and lease it to the Georgia
 7  Southwestern Railroad, Inc.
 8      Q    Okay. So basically, y'all are responsible
 9  for the maintenance of the --
10      A    Yes.
11      Q    -- railway?
12      A    Yes.
13      Q    Okay. Is that part of your lease
14  agreement --
15      A    Yes.
16      Q    -- with them?
17           Do you have a written lease with them?
18      A    Yes.
19      Q    Okay. What are the general terms of that
20  lease?
21      A    In regards to what?
22      Q    Use, maintenance, how long the lease is, what
23  it's for, what the lease is for.
24      A    The lease is for the purpose of the Georgia
25  Southwestern Railroad Company to provide common carrier
```

**Page 9**

1  service on the line. And as far as the lease, it's a
2  lease with purchase to -- an option to purchase and
3  kind of evergreen in that nature as far as the lease.
4    Q  Okay.
5    A  And as far as the, you know, maintenance and
6  paying property tax and everything, that falls to us,
7  the Georgia Southwestern Railroad.
8    Q  Okay. And what specifically does it say with
9  regard to maintenance that the Georgia Southwest
10 Railroad is responsible for?
11   A  Specifically, you know, I can't quote it
12 verbatim.
13   Q  Oh, I'm not asking word for word. I'm just
14 saying generally; what it is you have to do.
15   A  We're responsible for all the maintenance,
16 whether it's incidental or capital.
17   Q  So that would be things like replacing
18 crossties and that sort of thing?
19   A  Yes.
20   Q  Okay. Like if you go along and you see one
21 crosstie that looks like it's rotten, that's part of
22 the lease, you're supposed to replace it?
23   A  No.
24   Q  What sort of thing would you do to conform
25 with the maintenance part of the lease?

**Page 10**

1    A  Actually, we would maintain this railroad to
2  a FRA standard of Class II.
3    Q  Okay. What does that mean, exactly? I'm not
4  familiar with that.
5    A  The FRA, Federal Railroad Administration, has
6  a book of regulations, you know, for a lot of things
7  more than railroads, but there's a particular set of
8  track standards.
9    Q  Okay.
10   A  And within that track standard, they have a
11 set of guidelines, such as your tie question. There's
12 a minimum number of good ties evenly distributed over a
13 39-foot rail length, which -- and that's just one
14 example that related to your question.
15   Q  Okay. So is it more of a subjective
16 standard? You don't just -- you know, you're walking
17 or riding down the railroad on a maintenance car or
18 whatever, and you see --
19   A  No. It's objective.
20   Q  Okay. So there's no set standard where, if
21 there's a part of a certain piece of the crosstie
22 missing, then that means you got to replace it or -- no
23 set standard like that? It's just a general --
24   A  No. It's objective.
25   Q  Okay. If you would, tell me a little bit

**Page 11**

1  about the history of the railroad; of this particular
2  company. When did y'all start?
3    A  The actual Georgia Southwestern Railroad,
4  Inc., was incorporated -- I can't recall whether it was
5  '94 or '96, which was owned by -- it was a subsidiary
6  of Rail-Tex of San Antonio, who originally leased this
7  line in '88 under the name of Georgia & Alabama
8  Railroad. But they put it together with three other
9  properties in Georgia around '94 or '96 to create the
10 Georgia Southwestern Railroad, Inc.
11   Q  Okay. And you said Rail-Tex?
12   A  Rail-Tex.
13   Q  How do you spell that?
14   A  R-A-I-L T-E-X.
15   Q  Okay.
16   A  And then they incorporated their three
17 Georgia holdings into the Georgia Southwestern
18 Railroad, Inc., around '94 or '96. And then in
19 February of 2000, Rail-Tex was purchased -- the holding
20 company was purchased by another holding company, which
21 was Rail-America, out of Boca Raton, Florida, who then,
22 in turn, sold the corporation -- or the shares of the
23 corporation to myself and Dave Smoot in March of 2002.
24   Q  Okay. When y'all formed the corporation, did
25 you sign a lease to use the White Oak Spur at that

**Page 12**

1  time? Was that -- well, let me back up.
2       The lease that you have with -- who did you
3  say the lease was through that you --
4    A  Norfolk --
5    Q  Norfolk Southern?
6    A  Norfolk Southern.
7    Q  When you incorporated, at the same time, did
8  you sign the lease with Norfolk Southern to use that
9  particular spur, or was that later?
10   A  It was -- which corporation? You said when
11 it was incorporated.
12   Q  Georgia Southwest Railroad. When -- you said
13 you incorporated in '94 or '96?
14   A  The lease was signed in '88.
15   Q  Okay. So you basically inherited that lease?
16   A  It was owned by Rail-Tex, and they combined
17 the Georgia & Alabama with two other properties.
18   Q  Okay.
19   A  So they put their holdings together under one
20 corporate umbrella.
21   Q  Okay. And who was responsible for the
22 maintenance of the track prior to your becoming
23 incorporated, and by virtue of that, inheriting the
24 lease through Rail-Tex, if you know?
25   A  I don't understand. What do you mean

**Page 45**

1 him covering the damages, and he -- he admitted to
2 doing the fire and that, basically, he was not willing
3 to pay for it because of, you know, the quality of our
4 house -- if you would call it that -- didn't meet his
5 standards.
6   Q   The quality of your what now?
7   A   Property. Well, I was using an analogy as a
8 house -- the house being the bridge -- didn't meet his
9 standard; therefore, it was okay to burn it down, which
10 I don't think it's okay to burn your neighbor's house
11 down under any circumstance, but -- and that he would
12 contest -- you know, obviously, the meaning or the
13 paraphrase that I went away from the phone conversation
14 was that he was not going to take care of this matter
15 amicably.
16   Q   Okay. Did he ever say, "This was my fault"?
17   A   As I said, not having notes or a recording of
18 that, he did say it was his fire.
19   Q   Okay. But did he say it was his fault that
20 the bridge burned?
21   A   He said that he was doing a controlled burn
22 and that it got beyond his property boundary.
23   Q   Okay. But did he ever say, "It's my fault
24 that the bridge itself burned"?
25   A   Just by my definition of saying he left the

**Page 47**

1   A   The time frame that I can speak on, which
2 would have been, say, '99 when I was general manager to
3 the 2002, the amount being spent -- it would really
4 only be different by the number of inspections that
5 ended up to be required. There had been a track
6 project prior to my coming by Rail-Tex, which I don't
7 know the full amount of that tie and surface. I
8 believe it was sometime post flood, and so there was
9 only incidental track maintenance required because
10 there had been a track project by the parent company.
11   Q   Okay.
12   A   And so it had been sufficiently -- the rehab
13 project had been sufficient, not to require very much
14 incidental maintenance. And then the other routine
15 thing, the annual spraying, would have been the same,
16 whether they were shipping or not shipping.
17   Q   Okay.
18   A   The brush cutting program would have been the
19 same as any other line segment that we operate on. So
20 those two things would have been constant. The number
21 of track inspections, the time would have been the only
22 thing that would have varied.
23   Q   Okay. Did you get an estimate for the repair
24 of the track from anyone other than Mr. Lindsey?
25   A   You mean the trestle?

**Page 46**

1 boundary -- the fire go beyond his boundary, and it was
2 the fire that burned the bridge, he was admitting
3 fault.
4   Q   No, sir. That's not what I'm saying. I'm
5 saying: Did he ever tell you that this bridge burned
6 because that it was my -- actually my fault? Did he
7 say that it was my fault that the bridge burned? Not
8 just that the fire got away from him. Did he say the
9 bridge burned through my fault?
10   A   He said that it was his fire that burned the
11 bridge.
12   Q   Okay. Would you say that there was more or
13 less maintenance done on the track after the time that
14 Louisiana Pacific stopped their operations?
15   A   Would you restate. Be more specific. As
16 compared to when?
17   Q   Okay. From -- I believe you said they ceased
18 operations in 2002.
19   A   Yeah. I didn't recall the exact date. I
20 believe it was the end of '02.
21   Q   Well, from whatever time it was that they
22 ceased their operations to the time of this fire, do
23 you think that you spent more or less money on
24 maintenance than the time period prior to Louisiana
25 Pacific going out of business?

**Page 48**

1   Q   Uh-huh.
2   A   No.
3   Q   You didn't shop around or anything? See who
4 was the cheapest one? You just went with the first one
5 you got?
6   A   I went with our bridge contractor.
7   Q   Okay. So you've got a contract with
8 Mr. Lindsey on an ongoing basis?
9   A   We have a service contract with him, yes.
10   Q   Okay. What are the terms of that contract?
11   A   It's -- it's not exclusive.
12   Q   So you were -- I'm sorry. Go ahead.
13   A   No. I mean, it's a con -- any contractor
14 that does work on our property, we have a service
15 contract. It doesn't mean that it's exclusive. We may
16 have -- say like with car repair, we may have multiple
17 companies that we have service contracts with.
18   Q   So you were free to go get other price quotes
19 on the repair of the trestle if you wanted to?
20   A   Sure.
21       MR. ALLRED: Okay. Y'all, if I
22   could have just a minute to look through
23   these documents that I was just
24   produced, I think I'm done, unless I
25   have any questions on these. So if we

```
 1    want to just go off the record for a
 2    minute, and I'll look through these.
 3         MR. JOHNSON: That's fine.
 4              (Brief recess)
 5         MR. ALLRED: I'm done with you.
 6         MR. JOHNSON: Let me ask you a few
 7    questions -- back on the record -- to
 8    add a few follow-up questions to the
 9    questions that Craig has asked.
10    Specifically, I want to mark as
11    Plaintiff's Exhibits 1 and 2.
12      (Whereupon, Plaintiff's Exhibit Numbers 1 and 2
13       were marked for identification.)
14              EXAMINATION
15  BY MR. JOHNSON:
16    Q    I'd like you to refer to Plaintiff's Exhibits
17  1 and 2 in reference to the weigh bills that we
18  discussed earlier. And this was for equipment that was
19  moved along that spur line in 2003; is that correct?
20    A    Yes.
21    Q    Okay. Could you explain exactly what the
22  equipment was and why it was being used?
23    A    It's -- it was equipment that came out of the
24  former Louisiana Pacific plant. They had two
25  production lines. This represents the presses at one
```

49

```
 1  of the production lines where the plant was being
 2  dismantled, and its future was up in the air at that
 3  point in time.
 4    Q    And prior to this equipment being moved, was
 5  there an inspection done of that spur line?
 6    A    Yes. Yeah. At any time that you have a line
 7  for whatever purpose had been deemed out of service,
 8  then you -- prior to the movement, you're required to
 9  have a track inspection.
10    Q    Okay. To your knowledge, was the track
11  inspection performed prior to moving this equipment on
12  that line?
13    A    Yes.
14    Q    And pursuant to the documents here, it
15  indicates that that was moved on December 16th, 2003.
16  To your knowledge, would that have been the date that
17  the equipment was actually moved along the line?
18    A    The attached page has the actual days that
19  the equipment moved.
20    Q    Okay.
21    A    And so looking at those pages, the empty --
22  the empty flatcar would have moved out on December the
23  9th of '03. Then the load was released for shipment on
24  the 16th. And then it looks like it probably moved on
25  the 17th.
```

50

```
 1    Q    Okay. And in order for these various cars to
 2  move along that line, is it essential that the line be
 3  in an operable capacity at the time that this freight
 4  is moved along the spur line?
 5    A    Yes.
 6    Q    And specifically, is it essential that the
 7  trestle be in an operable capacity in order to maintain
 8  this weighed load?
 9    A    Yes.
10    Q    Other than moving this freight along that
11  spur line, were there other instances after January of
12  2004, which the last car appears to have moved along
13  that line, were there other instances where cars were
14  moved along that line between January of 2004 and
15  February of 2005?
16    A    Yes. Best I can recall, we had some storage
17  movements out there.
18    Q    Okay. When a line is being maintained --
19  say, a brush cutting operation or a spraying
20  operation -- are cars running along that line in those
21  capacities?
22    A    The spraying is done by a high-rail vehicle;
23  high rail meaning a vehicle that has wheels that can
24  operate over the rail line. And spraying is usually
25  done by high-rail truck, and brush cutting is done by a
```

51

```
 1  high-rail machine; could be a truck or an
 2  excavator-looking type of machine, but it would operate
 3  on the rails as well.
 4    Q    So in order to have a brush cutting or a
 5  spraying or a high-rail vehicle is used, is it
 6  essential that the track be maintained in an operable
 7  capacity?
 8    A    Yes.
 9    Q    Okay. Would it be essential that this
10  specific trestle be maintained in an operable capacity
11  in order to maintain the spraying and the cutting of
12  that line?
13    A    Yes.
14    Q    To your knowledge, was that line -- the White
15  Oak Spur line either brush cut or sprayed during the
16  calendar year 2004?
17    A    Yes.
18         MR. JOHNSON: Can I get Plaintiff's
19    3 and 4.
20      (Whereupon, Plaintiff's Exhibit Numbers 3 and 4
21       were marked for identification.)
22  BY MR. JOHNSON:
23    Q    Terry, I'm going to show you what I'm marking
24  as Plaintiff's Exhibit 3. Can you explain what that
25  invoice is.
```

52

**Page 53**

A   It's an invoice from Utilco, Incorporated, and they provided brush cutting services on the segment from Eufaula to the end of track; former Louisiana Pacific property.

Q   Would that include the right-of-way adjacent to the trestle that we're here about today?

A   Yes.

Q   And exactly what is entailed in a brush cutting to maintain the right-of-way?

A   It's a -- their equipment has a large arm that has a mowing head capable of mowing down trees up to a certain diameter, and it's probably -- its head is probably 8 to 10 feet wide. And in this case, I happened to recall they made three passes on each side of the rail.

Q   Is that unusual?

A   It's not unusual. On this line where we did not have the active chipper on the end, we were just going to do one pass, and they did three passes on either side.

Q   Okay. And in doing three passes, they went above and beyond what you had anticipated needing just to maintain the right-of-way; is that correct?

A   Yes. Well, more than what we would have probably decided for that level of business.

**Page 55**

A   To my knowledge, yes.

Q   In spraying the White Oak Spur line, would that also include the trestle that we're talking about here today?

A   Yes.

Q   Do you know when -- the dates reflected here, to your knowledge, are the dates reflected on the invoice was accurate as to when the spraying was performed?

A   The specific dates of when it was performed are probably not on the invoice, but for that calendar year, yes.

Q   Okay. And to your knowledge, was it sprayed at least twice during the calendar year or possibly three times during the calendar year of 2004?

A   As best I could recall, yeah; at least twice. And that's what we were invoiced, and that's what we paid for them.

Q   Is that customary to spray approximately once or twice per year on each line?

A   It's -- it wasn't Georgia Southwestern. We -- we've sprayed at least twice each year. We -- you know, it stays green down here about year-round, so you have to do it at least twice.

Q   Okay. And is this your normal operating pass

**Page 54**

Q   Okay. I'm going to show you what I'm marking collectively as Plaintiff's Exhibit 4, which is a series of four invoices -- or excuse me -- five invoices from NaturChem. Can you explain who NaturChem is.

A   NaturChem is a -- NaturChem West, Incorporated, out of Conyers, Georgia, is a company that we trade with -- and have for a number of years -- that does our spraying. And so they spray, and that's for vegetative control over the line segment. And the miles where the bridge was was included in that spraying. And -- and so they're the contractor that would have sprayed that, and it required or normally requires at least two applications and then incidental follow-up.

Q   When NaturChem sprays more of your lines -- in particularly, the White Oak Spur line -- is it just the track, or is it any portion of the right-of-way of the track?

A   It -- you can trade or contract for varying widths. Tell you, at a minimum, you know, we're going to do 12-foot wide from the center of track, which is sufficient, but we always contract for a 24-foot wide.

Q   And to your knowledge, did they spray 24-foot wide on the White Oak Spur line?

**Page 56**

that you would maintain the spraying each year as well as a brush cutter each year on particular lines?

A   We do the spraying each year. The brush cutting is -- it's more variable depending on the line segment. I would say typically brush cutting every three to five years; or some segments, not at all, you know, depending on conditions. You know, like if -- we have other segments that go out along grain fields and stuff that don't require brush cutting, so it -- there's not a standard, per se, for every line being treated the same.

Q   Okay. Going along that same line, would you say, then, that on this White Oak Spur line, purely in terms of vegetative control, that you did more in the 2004 calendar year than you would on an average basis for a lot of the lines that you maintained?

A   Yes. Because of the brush cutting, that was more -- we did not brush cut nowhere near a hundred percent of the rest of the railroad. That one we did, and it -- from the time the plant closed -- from the time Louisiana Pacific closed, numerous times I went out there with city and county governments of Eufaula, Barbour County, to try to help get a new suitor in and restart the plant. And so there was different levels of optimism throughout that time period.

1   We always believed that someone eventually
2   would reopen the plant, and so we kept that going. And
3   we knew that there was going to be some shipments of
4   equipment in and out, and the reason, really, for the
5   wider brush cutting out there was not so much, you
6   know, what's required for the track but just to assure
7   that there -- you know, the presses or something would
8   not have been brushed along the side of them.
9       Q   Okay. And because you were continuing to
10  negotiate with potential customers that were going to
11  utilize that spur line, was it essential that you
12  maintain that spur line in an operable capacity?
13      A   Yes.
14      Q   And prior to the fire that we're here about
15  today, was that line maintained in an operable
16  capacity?
17      A   Yes.
18      Q   Just one or two other questions.
19          To your knowledge, has Georgia Southwestern
20  Railroad ever given authorization to an adjacent
21  property owner to utilize the railroad as a firebreak
22  or as some other means of controlling a fire?
23      A   No, sir.
24      Q   Okay. Is it standard practice of the
25  railroad if a adjoining landowner is doing a controlled

57

1   burn that they maintain their own firebreaks rather
2   than utilizing the railroad as a firebreak?
3       A   Yes. That they -- yeah. We in no way,
4   shape, or form would, you know, give permission to
5   utilize right-of-way. And the other locations people,
6   you know, at -- you know, the plowed-up section or
7   whatever has a firebreak alongside of our right-of-way.
8       Q   Okay. To your knowledge, was there a
9   separate firebreak constructed in this location, the
10  White Oak Spur line, by Mr. Mitchell or somebody else
11  associated with Mr. Mitchell?
12      A   Not to my knowledge, no.
13          MR. JOHNSON: Okay. I think that's
14  all I have.
15          MR. ALLRED: I'm going to have to
16  object to the form of that question.
17  Didn't get it in there in time, but --
18          MR. JOHNSON: You got to jump in
19  there.
20          MR. ALLRED: I know.
21          MR. JOHNSON: Got to be quick.
22  So is that all you have?
23          MR. ALLRED: That's all I have.
24          (Deposition concluded at 11:07 a.m.)
25

58

CERTIFICATE

GEORGIA:

MUSCOGEE COUNTY:

I hereby certify that the foregoing transcript was taken down, as stated in the caption, and the questions and answers thereto were reduced to typewriting under my direction; that the foregoing Pages 3 through 58 represent a true, complete, and correct transcript of the evidence given upon said hearing; that I am not a relative, employee, attorney, or counsel for any of said parties in the case; that I have no financial interest in the action.
Before the deposition began and pursuant to Article 8.B of the Rules and Regulations of the Board of Court Reporting of the Judicial Council of Georgia, I made the following disclosure:
I am a Georgia Certified Court Reporter. I am here as a representative of Accredited Court Reporters (ACR). ACR was contacted by the offices of Defendant's Counsel to provide court reporting services for this deposition. ACR will not be taking this deposition under any contract that is prohibited by O.C.G.A. 15-14-37(a) and (b).
This, the 28th day of August, 2006.


Grace F. Lengmueller, B-2132
Registered Professional Reporter

59